**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| COREY TUCKER, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>PEYTON PALAIO; MARK D. REILLY; MARK JENNINGS; SKELMIS, LLC (d/b/a RH NATURAL PRODUCTS, LLC); TAUTLINE, LLC; FASTINCENSE.COM; LGI HOLDINGS, LLC (d/b/a ALPHABET WHOLESALE); LP IND., LLC (d/b/a OLISTICA LIFE SCIENCES GROUP, CENTRALIZED SERVICES, JORDAN PROCESS, CASCADE NATURALS, DELLA TERRA PHARMACEUTICALS, NATUREA BIOMATERIALS [a/k/a CANNOPY CORPORATION]); JOPEN LLC (d/b/a A1 WHOLESALE, PARTY NUTS, EVOLUTIONARY ORGANICS, INNOVO ACTIVAS, AMERICAN KRATOM-D); MARTIAN SALES, INC.; CAG HOLDINGS CO, LLC (d/b/a COMPANION AG); CALIBRE MANUFACTURING, LLC (f/k/a ADVANCED NUTRITION, LLC); FMK GROUP, LLC. (d/b/a OLISTICA LIFE SCIENCE GROUP); JOHN DOE CORPORATIONS 1-10; and OTHER JOHN DOE ENTITIES 1-10;<br><br>     Defendants. | Case No.  3:25cv488<br><br>**COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

  Plaintiff Corey Tucker ("Plaintiff") brings this action on behalf of himself and all others

similarly situated against Defendants Peyton Palaio; Mark D. Reilly; Mark Jennings; Skelmis,

LLC (d/b/a RH Natural Products); Tautline, LLC; FastIncense.com; LGI Holdings, LLC (d/b/a

Alphabet Wholesale); LP IND., LLC (d/b/a  Olistica Life Sciences Group, Centralized Services,

Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a

Cannopy Corporation]); Jopen, LLC (d/b/a A1 Wholesale, Party Nuts, Evolutionary Organics,

Innovo Activas, American Kratom-D); Martian Sales, Inc.; CAG Holdings Co, LLC (d/b/a

Companion AG); Calibre Manufacturing, LLC (f/k/a Advanced Nutrition, LLC); and FMK

Group, LLC (d/b/a Olistica Life Science Group) (collectively, "Defendants").  Plaintiff makes

the following allegations pursuant to the investigation of his counsel and based upon information

and belief, except as to the allegations specifically pertaining to himself which are based on

personal knowledge.

## NATURE OF THE ACTION

1.      This is a civil class action lawsuit against Defendants for false, misleading,

deceptive, and negligent sales practices regarding their Remarkable Herbs kratom powder and

capsule products (collectively, the "Products"[1]).  Kratom is a dried leaf that is sold as a loose

powder, packaged into capsules, or made into an extract.  However, what reasonable consumers

do not know, and Defendants fail to disclose, is that the active ingredients in kratom are similar

to opioids.  That is, kratom works on the exact same opioid receptors in the human brain as

morphine and its analogs, has similar effects as such, and critically, has the same risk of physical

addiction and dependency, with similar withdrawal symptoms.  When reasonable consumers

think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and

morphine; they do not expect that the "all natural" product bought at their local corner store

operates like an opioid, with similar addiction and dependency risks.  Kratom is perniciously

addictive – on an entirely different level than caffeine or nicotine – and it has sunk its hooks into

tens of thousands of unsuspecting consumers and caused them serious physical, psychological,

and financial harm.  Defendants have intentionally and negligently failed to disclose these

---

[1] The Products include any and all Remarkable Herbs kratom products, including the varying kratom strains: "Bali Kratom," "Indo Kratom," Maeng Da Kratom," "Malaysian Kratom," "Thai Kratom," and "Vietnam Kratom."

material facts anywhere on their labeling, packaging, or marketing materials, and they have violated warranty law and state consumer protection laws in the process.

2.      Defendants rely on their Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way.  Reasonable consumers do not expect the pouches of kratom powder and bottles of kratom capsules, which they can purchase at gas stations and corner stores, to contain a product with the same addictive potential of morphine and its analogs.  Defendants rely on this ignorance and do nothing to correct it.  Such activity is outrageous and is in contravention of Virginia law and public policy.

3.      Extensive investigative reporting by the Tampa Bay Times, and upon the research of counsel, has revealed that Defendants are all part of a singular enterprise responsible for various aspects of growing, importing, designing, manufacturing, testing, processing, labeling, packaging, shipping, marketing, and selling their kratom Products under the OPMS, Remarkable Herbs, and Whole Herbs brand names across the United States (the "Kratom Enterprise.").[2]  The Kratom Enterprise is spearheaded by Defendants Peyton Palaio and Mark Reilly.

4.      Defendants have employed a web of shell companies, alter egos, business names, assumed names, and trade names to obfuscate the immense scope of their operation and dodge liability for their actions with the Kratom Enterprise.  Defendants operate collectively: each of them is within the chain of distribution of the Products, operates as the Kratom Enterprise, controls or owns the Kratom Enterprise, and/or is an affiliate of the Kratom Enterprise.

---

[2] *See* Hannah Critchfield, Helen Freund and Langston Taylor, *DEADLYDOSE PART 3: Kratom's path across the US is marked by deception and secrets*, TAMPA BAY TIMES (December 17, 2023), htt2s:// project. tampabay. com/ investigations/ deadly- dose/ kratom- industry- opms-supply-chain-indonesia-florida; Hannah Critchfield, *A major US kratom brand relies on a maze of companies. Here's the list,* TAMPA BAY TIMES ( Dec. 19, 2023), https://www.tampabay.com/investigations/2023/12/19/major-us-kratom-brand-relies-maze-companies-heres-list/ .

Defendants share principals, membership, agents, and addresses.  Thus, Defendants should be considered as part of a collective whole operating in furtherance of the Kratom Enterprise at the behest of Peyton Palaio, Mark Reilly, Mark Jennings, and other key unknown individuals.

5.    Defendants Peyton Palaio and Mark Reilly have a history of prioritizing profits over public health.  They are no strangers to the civil *and* criminal legal systems.  The Products are sold as part of the Kratom Enterprise, and have killed multiple people, resulting in wrongful death lawsuits and millions of dollars in settlement payments.

6.    Plaintiff seeks relief in this action on behalf of himself, and as a class action, on behalf of similarly situated purchasers of Defendants' Products, for the following violations of: (i) Virginia's Consumer Protect Act VA. Code Ann. § 59.1-196, *et seq.* (the "VCPA"); (ii) breach of implied warranty; (iii) unjust enrichment; and (iv) fraud by omission.

## **PARTIES**

7.    Plaintiff Corey Tucker is a citizen and resident of Richmond, Virginia.  He first purchased Defendants' Products in or around 2022, during which time he was a resident of Virginia.  Plaintiff Tucker purchased the Products from a smoke shop in Virginia.  Plaintiff Tucker did not believe the Products to be harmful and was not aware that Defendants' Products carried a potential risk of being addictive.  Plaintiff Tucker had been involved in a car accident that resulted in chronic back pain.  As such, he began looking into alternative pain management. Plaintiff Tucker did not want to take anything addictive, and as such sought to use herbal alternatives for his pain.  Plaintiff Tucker reviewed the Products' packaging before making his purchase and relied on Defendants' representations in deciding to purchase the Products.  A warning on the Products packaging would have corrected his belief, but there was none.  Plaintiff Tucker used Defendants Products with no realization he had an addiction until he attempted to

use less of the Product.  Once he did so, Plaintiff Tucker experienced severe withdrawal symptoms including fever, insomnia, and restless leg syndrome.  The symptoms from the withdrawals are so serious that on multiple occasions he has sought medical attention for them. This was when Plaintiff Tucker realized Defendants did not tell the truth about their Products, and that he had become addicted to them.  Had he known that Defendants' Products were highly addictive, by way of a warning on the Products' packaging, he would have never purchased the Products.  Due to Plaintiff Tucker's addiction, he is still using the Products, even though he wishes to stop.

8.      Defendant Peyton Palaio (also known as Peyton Palaia, Payton Palaia, and Payton Palaio) is a citizen and resident of the State of Georgia.  Peyton is the head of the Kratom Enterprise.  Though he may not appear on any official business filings, interviews with employees and kratom distributors "mention Palaio by name as the CEO or head of the [Kratom Enterprise]."[3]

9.      Defendant Mark Reilly is a citizen and resident of the State of Georgia. Defendant Reilly is closely involved with Defendant Palaio and together they work to direct the actions of the Kratom Enterprise.

10.     Defendant Mark Jennings is a citizen and resident of the State of Georgia and works closely with the Defendants to direct the operations of the Kratom Enterprise.

11.     Defendants Palaio, Reilly, Jennings, and all other unknown individuals who will be named once identified are hereinafter referred to collectively as the "Individual Defendants."

12.     Defendant Skelmis, LLC, d/b/a RH Natural Products and formerly registered as RH Natural Products, is registered in Texas and maintains its headquarters in Santa Clarita,

---

[3] Critchfield et. al, *supra* note 2.

California.  Defendant Skelmis, LLC owns and operates the website www.remarkableherbs.com, and also advertises, markets, distributes, and sells its Products in Virginia and throughout the United States.  Defendant Skelmis, LLC is registered at 5900 Balcones Drive Suite 100 Austin, Texas 78731.

13.     Defendant Tautline, LLC is the manager of Skelmis, LLC and is registered in Texas at the same address as Skelmis, LLC (5900 Balcones Drive Suite 100 Austin, Texas 78731).[4]

14.     The exact identity of Defendant FastIncense.com is unknown to Plaintiff at this time.  Defendant FastIncense.com hides its registration information but represents that its registered agent is the same as the registered agents for Skelmis, LLC and Tautline, LLC.  Defendant FastIncense.com is the primary online retailer of the Products and sells the Products in Virginia and throughout the United States.

15.     LGI Holdings, LLC (d/b/a Alphabet Wholesale) ("LGI") is a Wyoming limited liability company located at 30 N Gould St. Ste. 22533, Sheridan, WY 82801 USA.  The 2021 Annual Report lists 2550 Sandy Plains Road, Ste. 225 Box 319, Marietta, GA 30066 as its principal office address.  The 2024 Annual Report lists Conner W. Watts, 245 Peachtree Center Ave., NE, Atlanta, GA 30303 as the organizer of Defendant LGI Holdings, LLC.[5]  However,

---

[4] Tautline is the manager of eleven different LLCs, all of which are used to obfuscate and confuse their direct involvement in the Kratom Enterprise.  (*See* https://opencorporates.com/ officers?q=Tautline+LLC).  Ten of these LLCs are named after various Greek Gods, heroes, and similar mythos to hide their true purpose but have links to the Kratom Enterprise and sell the Products, as well as Defendants' other brands, such as Whole Herbs and OPMS.  Aaron Michelson is listed as the organizer for Tautline and the eleven organizations for which Tautline is the manager.  On information and belief Aaron Michelson is the attorney responsible for managing Tautline's various business entities.

[5] Conner Watts is an Atlanta-based attorney who appears on many of the Kratom Enterprise's legal filings.  He appears to handle legal filings for real property holding companies for the Kratom Enterprise.  Each parcel of land or building is assigned its own LLC as a means of hiding the extent of the Kratom Enterprise.  For instance, Conner Watts is listed as the organizer for

Peyton Palaio has claimed in signed court filings that he is the true head of LGI Holdings. Documents filed in a lawsuit against Palaio and LGI show that Peyton Palaio used LGI to enter into a kratom supply deal with Cleanview Distribution Group, a company located in Los Angeles, California.  LGI appears to handle kratom imports for the Kratom Enterprise, with internal documents showing that it intended to import around **35 million kilograms of kratom** over a six-year period through the ports of Oakland and Los Angeles.  Upon information and belief, that kratom was ultimately intended for use in the manufacture of the Products at issue in warehouses in Georgia, Colorado, and Texas.  Palaio placed orders for raw kratom through LGI to obfuscate that the Kratom Enterprise was behind it.

16.    LP Ind., LLC (d/b/a Olistica Life Sciences Group, Centralized Services, Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a Cannopy Corporation]) ("Olistica" or "Jordan Process") is a Wyoming limited liability company located at 30 N Gould St., STE 20464, Sheridan, WY.  Its 2021, 2022, and 2023 Annual Reports listed 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA 30066 as its principal place of business.  Until early 2023, Peyton Palaio openly held himself out as the CEO of Olistica.[6]  This allegation is substantiated by emails from Peyton which were filed as exhibits in another lawsuit,[7] in which Peyton refers to Olistica as his "operation"[8] which is part of a network of

---

"Highway 160 Way, LLC" which holds title to the land in Springfield, Colorado where Defendant Jordan Process operates a kratom extract lab.  Conner is also the organizer of  "1199 Industrial LLC," which owns a building located at 1199 Atlanta Industrial Drive, Marietta GA, which is where Defendant Calibre Manufacturing processes and encapsulates the Products.  (*See* https://opencorporates.com/officers?utf8=%E2%9C%93&utf8=%E2%9C%93&q=Conner+Watts &jurisdiction_code=&type=officers.)

[6] *See,* Critchfield et. al, *supra* note 2; *see also* Critchfield, *supra* note 2.

[7] *Cleanview Distribution Group, LLC, v. LGI Holdings LLC, Peyton Palaio, et al.,* No. 2:21-cv-07178-SB-JC, Complaint ("*Cleanview* Complaint").

[8] **Ex. A**, Olistica Slide Deck.

corporations forming the "largest kratom business in the United States."[9]  That email from Peyton also included an attachment, a business presentation for Olistica which details that Olistica and the other LP Ind., LLC entities are in charge of kratom farming, kratom research, and kratom extract production.  Jordan Process is named after Palaio's brother, Samuel Jordan Palaio, who died of a heroin overdose in 2015.[10]

17.    Jopen, LLC (d/b/a A1 Wholesale, Evolutionary Organics, Innovo Activas, American Kratom-D, and Party Nuts), is a limited liability company formed in Texas and Wyoming.  Upon information and belief, Defendant Jopen acts as the distributor of the Products throughout the United States, including in Virginia.

18.    Martian Sales, Inc. is a Wyoming corporation.  The Martian Sales' 2021 and 2022 Annual Reports list 2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia 30066, as its principal business location. Upon information and belief, Defendant Martian Sales operates out of 1880 West Oak Parkway, Suite 214, Marietta, GA 30062.  Defendant Mark Reilly is the president of Martian Sales, Inc.

19.    CAG Holdings CO, LLC (d/b/a Companion AG) is a Colorado foreign entity with its principal place of business at 23298 US Highway 160, Springfield, CO 81073.  It operates under the Olistica Life Sciences Group umbrella of Defendant entities.  Internal documents filed as exhibits in another lawsuit indicate that Companion AG is in charge of cultivating relationships with kratom farmers in South Asia.[11]  It describes itself as "a modern co-op that manages select commercial agricultural crops" that focuses "on medicinal plants, botanicals, and biomaterial feedstock alternatives or sustainable materials feedstocks."  It deals with farmers

---

[9] Cleanview Complaint, *supra* note 7, ¶ 2

[10] Critchfield et. al, *supra* note 2.

[11] **Ex. A**, Olistica Slide Deck.

which "range in size from one-acre farms to those with more than 10,000 acres in agricultural production."[12]

20.     Calibre Manufacturing, LLC is a Wyoming limited liability company.  Its Articles of Organization in 2021 lists 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA 30066 as its principal place of business.  Calibre operates at 1199 Atlanta Industrial Drive, Marietta, GA, and 9305 Industrial Trace, Alpharetta, GA 30004, where it processes the Products for bulk finished good production.  Calibre Manufacturing used to be known as Advanced Nutrition LLC.[13]  Advanced Nutrition LLC used to list 1880 West Oak Parkway, Suite 214, Marietta, GA as its principal place of business, where Peyton Palaio and Mark Reilly ran one of their prior ventures, a synthetic cannabis operation.

21.     FMK Group, LLC, also known as Olistica Life Science Group ("Olistica") is a Wyoming limited liability company.  The 2021, 2022, and 2023 Annual Reports for FMK Group, LLC, list 2550 Sandy Plains Rd., Suite 225, Box 319, Marietta, Georgia 30066, as its principal business location.

22.     Defendants John Doe Corporations 1 through 10 are corporations, the names and addresses of residences of which are presently unknown.

23.     Defendants John Doe Entities 1 through 10 are other persons or legal entities, the names and addresses of residences of which are presently unknown.

24.     Defendants should be treated as a single enterprise for purposes of this litigation because they have:

    (a)     Commingled their funds and other assets and failed to segregate funds between them;

---

[12] *Id.*

[13] Critchfield, *supra* note 2.

(b)     Treated each other's assets as their own;

(c)     Failed to maintain minutes and corporate records and confused the records of the other Defendant entities;

(d)     Used the same business locations and employed the same employees;

(e)     Share a unity of interest and ownership that each of the Defendants acts merely as a shell of the Kratom Enterprise as a whole; and

(f)     Failed to adequately capitalize themselves such that if only one entity were to be held liable for the actions of the whole it would be unable to compensate Plaintiff and the putative class for their harms and thereby promote injustice, unfairness, and fraud.

25.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

27.     This Court has personal jurisdiction over the parties because Plaintiff resides in Virginia, is a citizen of Virginia, submits to the jurisdiction of the Court, and because Defendants have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in this State.  Defendants therefore have sufficient minimum contacts with this State, including within this District, and/or intentionally availed themselves of the benefits and privileges of the Virginia consumer market, and directed their activities thereto, through their business activities in furtherance of the Kratom Enterprise within the State, and through the sale of the Products to distributors and wholesalers within this District and throughout this State.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly do business in this District by directing the sale of their Products to wholesalers and distributors in this District.  Further, the same misrepresentations, omissions, and injuries giving rise to the claims alleged herein have occurred in this District (e.g., the distribution and sale of the Products to Plaintiff, and Plaintiff's subsequent addiction to kratom).

## FACTUAL ALLEGATIONS

### A.    Background and Pharmacology of Kratom

29.     "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

30.     Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[14]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

31.     Kratom's variable effects have historically been part of its appeal.  For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-

---

[14] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

32.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

33.     To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[15]

34.     The chemicals in the kratom plant, which produce a psychoactive effect when ingested, are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

35.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

36.     MG and 7-OH exhibit a wide variety of pharmacological effects, resulting in a highly dose-dependent response.  For example, a low dose (0.5 grams to 3 grams) of kratom is typically described as stimulating or energizing, whereas a high dose (3+ grams) is described as euphoric, sedating, and analgesic.  On the whole, however, kratom's high is not overwhelming

---

[15] When kratom leaves are extracted into a liquid formulation, it is colloquially called a kratom "extract shot."

like it would be for a "hard" drug like cocaine or heroin – it is somewhat more subtle but its effects are nonetheless substantially similar to opiate-based painkillers such as hydrocodone and oxycodone in sufficient dosages.

37.    Kratom's variable but not debilitating effects have always been part of its appeal. For instance, the use of kratom in Southeast Asia has been documented back for at least 150 years and the earliest accounts described both a stimulant effect for use in hard day-labor when fresh leaves are chewed, and an analgesic and relaxing effect if brewed into a tea.

38.    Most crucially, MG and 7-OH also interact with the mu-opioid receptor.  The mu-opioid receptor is known as "the gateway to addiction" because it is the receptor with which all opiates/opioids interact to produce the classic opiate high: euphoric, sedating, and analgesic. This means that MG and 7-OH interact with the primary receptor that heroin and oxycodone interact with.

39.    There are other opioid receptors, but the mu-opioid receptor produces the most "hedonic" or habit-forming effects such as euphoria and analgesia.

40.    Kratom is therefore considered by health professionals to be similar to an "opioid" and a "quasi-opiate."

41.    The notion that kratom is substantially similar to an opioid, and a quasi-opiate, is reaffirmed by a few facts.  First, kratom's effects are very similar to those of other opioids. Second, when administered, kratom alleviates opioid withdrawal symptoms.  Third, repeated use of kratom in itself results in opioid withdrawal symptoms.

42.    All substances which act on the opioid receptors carry a very high risk of addiction, and kratom is no exception.

43.    Addiction occurs when an opioid is ingested on a regular basis.  Over time, the user develops a tolerance to the drug, requiring increased dosages to get the same effects as a lower dose used to have.  As the dosages go up, the body becomes dependent on some amount of the drug to feel normal.  When the drug is suddenly taken away, the user feels much worse than before they started taking the drug: this is what is known as withdrawal.

44.    Opioids are addictive not just because of the pleasurable effects that they produce, but because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop, but they cannot.

45.    The symptoms of kratom withdrawal are very similar to those of traditional opiate withdrawal.  Such symptoms include: irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme dysphoria and malaise.

46.    Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use them to avoid the pain of withdrawal.  It no longer is about getting high, but about not feeling "sick."

47.    With kratom in particular, users note that the addiction sneaks up on them, and that it feels as though, over time, the color has been sapped from their lives.  Long term users of kratom have reported experiencing depression, anxiety, anhedonia, and reduced sex drive.

**B.    Kratom Use and Addiction in the United States**

48.    Kratom use in the United States has exploded over the past decade.  As of 2023, the American Kratom Association–of which Defendants are the founders and utilize as a

14

marketing arm–estimates that kratom is a 1.5 billion dollar a year industry, with 11-15 million annual users in the United States, up from 3-5 million users in 2016.

49.     Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

50.     However, kratom is still generally a relatively unknown substance to the average consumer, and most people have never heard of it.  Kratom sellers advertise that it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

51.     Further, because kratom does not produce as extreme of a "high" as cocaine or heroin, it is easy for users to take kratom daily without realizing they are developing an addiction and harming themselves.  This makes kratom particularly insidious as addiction sneaks up on unsuspecting and uninformed users.

52.     As a result of kratom manufacturers, retailers, and advertisers failing to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because kratom is relatively unknown in the United States, there are not well-established recovery resources for

addicted users to turn to for resources and aid.  Some kratom users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

53.    The reports from addicted kratom users are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 49,000 members as of May 2025.[16]

> One user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years. Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?**  I made myself believe that I had underlying issues that the Kratom was helping.  Spoiler: It wasn't.  **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.**  I started browsing this subreddit and reading everyone's stories and I related to every single one.  **Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression.**" (emphasis added).

> A gas station employee wrote: "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I'm talking about) **it's just mind blowing to me how many people are practically addicted and how many customers literally scavenge their money to pay for their daily shot**.  Why are people so addicted especially to those shots."

> Another user solicited "extract horror stories" – one user responded: "Took 2-3 shots a day for almost 2 years.  How did it screw me up?  Let me count the ways. Financially it was draining me, 100%! **I would estimate 60% of my hair fell out. My skin was grey.  My eyes were dark.  I became a hermit.**  No longer wanted to do anything, including self care or hygiene.  Just taking a shower was a chore I had to talk myself into the last few months.  I was disgusting and did not care at all.  **All I cared about was that I had enough K for tomorrow.**"

> In response to the same "extract horror stories" post, another user responded: "I used [kratom extract] pills and sometimes the shots for over 5 years.  I'm now 290 days clean from them.  **They were so hard to kick bc of how addicting they are. And you can just walk in the store and buy them.**  I was spending $45 day on this

---

stuff.  **I wasted tens of thousands of dollars on it and my life suffered.**  Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good.  I'm repairing my marriage and friendships.  Everything.  Stay away from this stuff."

Another user responded: "Amen.  This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to God hard drugs back in the day.  **Anywhere from 6-10 of these things daily for... years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing.  I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted 'borrowing' money from my 10 year old son.  Fuck this; I'm not living like this anymore."

About 2 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later.  Kratom was making me pretty miserable. I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 2 years ago, another user wrote: "What a difficult journey it has been.  I was a ~75 GPD [grams per day] user.  **Quitting kratom was one of the hardest things I've had to do in my life.** I learned the hard way that kratom causes withdrawals on a work trip 3 years ago.  I should have stopped then and there but I gave in because the RLS was so bad. … **Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much.**  I'm only a week free but after this experience I know for sure that I will never go back.  Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*. It said, in part: "It's been 23 hours since my last dose.  **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.**  As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit.  They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

Another user wrote: "**I think the perfect word to describe Kratom addiction is 'insidious'.**  Here is the definition – *'proceeding in a gradual, subtle way, but with harmful effects.'*  I think this is why it takes so long to realize what is going on.  There was never a rock bottom moment for me like there would be for other more conventional abused drugs.  No overdose, no bad behavior, no abusiveness to my

family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence.  Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV.  Wake up and do it all over again." (italic emphasis in original, bold emphasis added).

Another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years.  **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.**  I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals.  I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts.  Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "**I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc.  Fuck kratom, and fuck those who peddle it as a harmless cure-all**." (emphasis added)

Another user wrote: "For any newcomers: this stuff is absolutely no joke.  It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine.  I've cold turkey'd caffeine before and I had a slight headache for a couple hours.  I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug.  A serious drug.  And it's super freakin addictive**. *Extracts, powder, or in my case, capsules…it doesn't matter*.  Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis added).

Another user wrote: "This stuff is a drug, and dangerous!  **I started taking it because of all the good things I heard and read about it**.  I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

Another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life.  I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle.  It was heavily affecting my mood overall, but especially in public settings.  I did not want to leave my house most days even if I did dose."

Another user wrote: "I have been taking OPMS black pills for about a year now. It has ran my bank dry. When I wake up in the morning I fucking crave this shit. I have never been addicted to opiates or anything like that. I get to the point where I am going to go cold turkey and am so confident but when I wake up my brain makes me think its okay to go get it. I cant talk to anyone about this in my family or friends. I have a very high stress job and am also going through a nasty break up. I feel so alone with trying to stop and when I betray myself and go to get more, i fight back tears in the parking lot (I am a grown ass man). I am not an emotional person and in my environment theres no room for emotions. Should I tapper off? What the fuck do I do?"

Another user wrote: "I was taking one to two opms gold shots a day (sometimes three) for about two years straight. When the 24hr mark hit the withdrawals kicked in hard. I had become absolutely obsessed with scavenging 20$ togther to make sure I got my shot each day. Constantly driving to the shop, hoping no one would see me pop out. I wanted to quit every night but just couldn't stand the withdrawals. I finally quit (on day 17 ct) with the help of a quit buddy I found in this sub. I'm still not right at all, RLS is there and my sleep is still off. I'm sneezing more than I ever have. But, music is back, I have more money in my pocket and I feel free from the grips. I've still got a long ways to go but am committed to never touching that shit again. It brought out the worst version of me."

54.     This Internet forum is filled with accounts just like these. The stories are consistent – well-meaning people who were looking to feel better, in mind, body, and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

55.     What is particularly insidious about kratom is that, at the early stages, many users are unaware of its negative side effects and its addictive potential, so when they begin to experience the consequences of addiction, they do not attribute it to the kratom. Rather, they take more of the substance thinking that it is helping them with their malaise.

56.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions. Defendants' Products have no warnings, whatsoever, that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency with withdrawal symptoms similar to those of traditional opioids.

57.     Consumers who knew the truth about kratom would not have purchased Defendants' Products or would have paid less than they did for them.

**C.      Peyton Palaio, Mark Reilly, and the Beginning of the Kratom Enterprise**

58.     The Kratom Enterprise was started in or around 2012 by Defendants Peyton Palaio and Mark Reilly at a small office in Marietta Georgia, located at 1880 West Oak Parkway, Suite 214.[17]  Palaio and Reilly are long-term associates and friends.  Indeed, Georgia Department of Motor Vehicles records show that a relative of Peyton's, Samuel R. Palaio, gave Reilly a truck in July 2012.[18]  Defendant Reilly then transferred ownership of the truck to Defendant Palaio a year later, in June of 2013.[19]

59.     At the time, the two were primarily focused on running a synthetic cannabis operation under the names Omerta Labs, LLC and Lunar Labs, LLC – both located at the same 1880 West Oak Parkway address where Defendants' first Products' trademark was registered.[20]  Palaio ran the operation, but Reilly was the registered agent for Lunar Labs at the time.[21]

60.     In 2012, the Georgia Bureau of Investigation (GBI) raided the office at 1880 West Oak Parkway to seize the synthetic cannabis that the two were producing.[22]  The agents had caught onto the duo because "they found an invoice, which listed suspected [synthetic cannabis] products recently shipped from the lab, in a nearby dumpster."[23]  During the raid, Palaio was

---

[17] **Exhibit B**, OPMS Trademark Registration

[18] **Exhibit C,** DMV Records

[19] *Id.*

[20] **Exhibit D**, DEA Lawsuit ¶ 21.

[21] *Lunar Labs,* GEORGIA CORPORATIONS DIVISION, https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=1671691&business Type=Domestic%20Limited%20Liability%20Company&fromSearch=True (last accessed Apr. 28, 2025).

[22] **Exhibit D** ¶ 21.

[23] Critchfield et. al, *supra* note 2.

also found producing one of the early versions of their kratom products.  As one GBI officer

recalled: "[Palaio] had a lot of kratom there … he was making a product, 'Kratom OPM,' he

called it … [t]o me, obviously, it was a nod to opium — to get your attention."[24]

61.    The 2012 GBI raid would not be Reilly and Palaio's only run in with law

enforcement.  In 2016 US Drug Enforcement Agency (DEA) agents located in Carson,

California seized two sophisticated and expensive drug manufacturing machines: a "JTJ-A Semi

Automatic Hard Capsule Filling Machine" along with "a SRJ-5 Small Soft Gelatin Capsule

Filling Machine."[25]  The machines were bound for "Precision Biologics," located at 1880 West

Oak Parkway, Suite 214, Marietta, Georgia.[26]  Research by the agents revealed that Precision

Biologics was not a legitimate corporate entity, however.[27]  Further research by the agents

showed that Defendant Palaio was associated with the 1880 West Oak Parkway address because

he had listed it as the principal place of business for his synthetic cannabis operations: Lunar

Labs and Omerta Labs, which he ran with Mark Reilly.[28]  The agents came to suspect that Palaio

and Reilly had ordered the machines without prior clearance from the DEA with the intent to

manufacture drugs.[29]

62.    The agents' suspicions were confirmed when, in January 2017, Defendant Palaio

filed a claim with the DEA "contending that he is the owner of the [] machines" and stating that

he was only going to use the machines "for research in the area of process scale-up of liquid

---

[24] *Id.*

[25] **Ex. D** ¶ 1.

[26] *Id.* ¶ 12.

[27] *Id.* ¶ 41.

[28] *Id.*

[29] *Id.* ¶ 21.

single dose products."[30]  Palaio's complaint was judged deficient, and he eventually dropped the claim.

63.     In truth, however, the capsule filling machines the DEA had seized from Reilly and Palaio were not intended for use in the production of synthetic cannabis.  Synthetic cannabis, like the kind Palaio and Reilly manufactured at the 1880 West Parkway Address, is not consumed in pill form – rather, it is smoked.  In reality, Palaio and Reilly had purchased the machines for use in the production of kratom.  The "liquid single dose products" Palaio claimed he was intending to use the machines to produce were not synthetic cannabis – they were OPMS kratom extract shots.

64.     After their two close brushes with the law, and a host of wrongful death lawsuits, Defendant Palaio and Mark Reilly (along with a cadre of other unknown associates) moved on from synthetic cannabis and began the Kratom Enterprise in earnest.

65.     From the outset, however, the Kratom Enterprise would be conducted differently.  Palaio and Reilly had previously operated under only a handful of LLC's, all of which they were directly connected to through their secretary of state filings.  This invited the prying eyes of the law and made tracing their operations too easy.  They would not make the same mistake in running the Kratom Enterprise.

**D.     The Kratom Enterprises' Supply Chain**

66.     If Defendant Palaio and Reilly wanted to avoid attention they realized they would need to abuse the corporate form to its fullest extent.  They decided to atomize their operations by employing separate corporate entities (i.e., the Defendant entities) for each part of the Kratom Enterprise, and they would no longer appear on multiple corporate fillings as officers.  They

---

[30] *Id.* ¶¶ 51-51.

would incorporate various business entities in multiple states, the majority of which would be in Wyoming where "ownership and operation locations" could be obscured from the public record.[31]  Indeed, Wyoming was chosen because it "offers some of the broadest privacy measures for company executives [] who want to remain anonymous."[32]

67.    None of the Kratom Enterprise's day-to-day operations would be conducted in Wyoming, however.  Instead, the Enterprise's trail runs primarily through four states: California, Georgia, Colorado, and Texas.

68.    Defendants Palaio and Reilly separately operate different business entities discretely through various stages of the supply chain to obscure the totality of their efforts in furtherance of their Enterprise.

69.    First, Kratom is grown by farmers in Southeast Asian countries such as Indonesia and Thailand.  After the kratom plant has matured its leaves are harvested, dried, and pulverized into fine powder.  The powder is then packaged into boxes and loaded onto cargo ships destined for the United States.

70.    The majority of kratom shipments will enter the country through the Ports of Oakland and Los Angeles, where it is stored in warehouses by domestic kratom suppliers.[33]

71.    Defendants contract with these suppliers to store kratom in such warehouses and provision kratom to the Kratom Enterprise through large monthly shipments.  To hide the fact that this kratom is intended for the production of the Products, only a few of the shell companies will take part in this stage of the supply chain.  Oftentimes, however, multiple Defendants – appearing to the kratom supplier as completely independent entities – will tag in and out of

---

[31] Critchfield et. al, *supra* note 2.

[32] *Id.*

[33] *Id.*

business dealing with suppliers to further obscure their activities (e.g., one entity will place an order for kratom from a supplier and then another will tag in and pay the invoice for that order).

72.     For example, in 2021 a lawsuit was brought by a kratom supplier against Defendant LGI Holdings, LLC for violating the terms of a supply agreement.[34]  The supplier alleged that it had agreed to maintain an inventory of at least 800 metric tons of kratom for LGI Holdings (owned and operated by Peyton Palaio) in a warehouse in Los Angeles.[35]  In exchange LGI/Palaio agreed to purchase 275-300 metric tons of kratom each month.[36]  Peyton represented to the supplier that he needed this much kratom because LGI was part of a larger "network of companies" which comprise "the largest kratom business in the United States" and that he "wanted to expand to integrate the supply, import, and distribution segments into [Defendants'] existing network, and eliminate supply chain disruption."[37]

73.     Over 30 shipments of kratom were made under the deal, destined (on paper) for a company called Alphabet Wholesale, located in an apartment complex in Pasadena, Texas. Alphabet Wholesale did not exist in any corporate filings, however.  In reality it was a fictious business name Peyton Palaio used for LGI Holdings, LLC, and the kratom was actually destined for Georgia.

74.      The transactions were further complicated by the fact that invoices for these shipments were not paid by LGI Holdings, rather they were paid by Defendant Jopen, LLC.

---

[34] *Cleanview* Complaint, *supra* note 7, ¶ 1.

[35] *Id.* ¶ 31.

[36] *Id.* ¶ 32.

[37] *Id.* ¶ 2.

75.    At first blush, Defendant Jopen does not appear to have any connection to Peyton Palaio or the Kratom Enterprise.  But Defendant Jopen is actually one of the shell entities Defendants use to hide their dealings and stymie investigations into the Kratom Enterprise.

76.    Fortunately, a 2021 lawsuit filed by Defendant Jopen itself gives the game away. The lawsuit, filed in San Diego County, was brought against a San Diego kratom supplier for failing to deliver bulk orders of kratom that Jopen had ordered and paid over $600,000 for.[38]  In the complaint, Jopen identifies itself as a Texas corporation "doing business as Innovo Activas and [] American Kratom-D."[39]  As noted above, however, Jopen also does business as A1 Wholesale, Evolutionary Organics, and Party Nuts.  This means that Jopen, LLC operates under at least 5 separate fictious business names.

77.    Despite this clear attempt to abuse the corporate form and hide its dealings, Jopen's true identity as a shell company of the Kratom Enterprise is made clear through invoices it attached to its complaint.  The invoices – one of which is reproduced below – show that Jopen placed orders for kratom but then billed and shipped the orders to its alter-egos, Innovo Activas and American Kratom-D.  The shipping address Innovo Activas and American Kratom-D listed was the very same address that Palaio and Reilly were found packaging OPMS kratom, and where the OPMS kratom trademark was registered: 1880 West Oak Parkway Suite 214, Marietta, Georgia.[40]

---

[38] **Exhibit E,** *Jopen LLC v. Sebastian Guthery, et al.,* No. 37-2021-00013845-CU-BC-CTL, Third Amended Complaint.

[39] *Id.*

[40] **Exhibit F,** *Jopen LLC v. Guthery et al.,* No. 3:21-cv-01233-L-BGS, Kratom Purchase Invoice, Doc. 1-2, at 21-23.



78.     Thus, Jopen, Innovo, and American Kratom-D are nothing more than shell corporations through which act in furtherance of the Kratom Enterprise to discretely purchase and transport kratom from California to Georgia.

79.     Once in Georgia, other Defendants – acting in furtherance of the Kratom Enterprise – step in to process, package, and test the Products before handing the Products off to other Defendants.  Here, Defendant Calibre Manufacturing receives shipments of raw kratom powder at various warehouses scattered around Marietta and Alpharetta, Georgia.[41]  The raw kratom is then processed and milled into a fine power for bulk finished good production.[42]

80.     The processed kratom powder is then sterilized and packaged.  Neither of these steps will occur in Georgia, however.

81.     The kratom is shipped off to Dallas, Texas where it is sterilized, packaged, and distributed.

---

[41] Critchfield, *supra* note 2.

[42] Critchfield et. al, *supra* note 2.

82.     The entity in charge of placing the Products in their official packaging is A1 Wholesale (aka Defendant Jopen, LLC/LP Ind., LLC).[43]  A1 Wholesale acts as a wholesaler of the Kratom Enterprises' various products.

83.     After packaging, employees at another LLC operated by the Kratom Enterprise fulfills online orders through the alter-ego FastIncense.

84.     FastIncense acts as the master distributor for the Remarkable Herbs Products, through which all other wholesalers and distributors, across the United States including in Virginia, must first order the Products.

85.     Moreover, during the pandemic, FastIncense became important for Defendants' other Products and was recommended for online purchases for consumers.[44]

86.     Accordingly, FastIncense knowingly and intentionally sells and ships the Products to buyers across the country, including in Virginia.  Specifically, Defendants have for years shipped significant amounts of Remarkable Herbs Products to wholesalers, distributors, and retailers in the state of Virginia.

87.     Thus, Defendants are, together, involved in every step of the Kratom Enterprises' supply chain, from import to distribution.  They act in tandem as conduits through which the Kratom Enterprise is run.  Together, these entities act as a single enterprise and purposely direct their activities at the Commonwealth of Virginia and every other State in the nation.  Below is a portion of an infographic created by the Tampa Bay Times to illustrate the Kratom Enterprises' peregrinations across the country.

---

[43] *Id.*

[44] **Exhibit G**.

88.     For years, Defendants have used their shell companies and deliberately convoluted business practices to hide their dealings and elude accountability for their actions.  No longer.



E.     **Defendants Knew or Should Have Known they were Selling a Highly Addictive Drug to Unsuspecting Consumers**

89.     Defendants represent that "Remarkable Herbs is the longest-running, most-trusted commercial Kratom company in the U.S., providing Kratom to more than 15,000 stores nationwide since 2001."

90.     Defendants manufacture the Products in a highly specialized lab and utilize highly technical knowledge about kratom and its alkaloids to synthesize the Products.  Thus, Defendants are acutely aware of the addiction risks posed by the Products.

91.     Despite this knowledge, Defendants failed to disclose Kratom's addictive potential to customers on the Products' packaging.

92.     Defendants have no excuse for their lack of a detailed disclaimer warning of kratom's harms on the Products' packaging.  The pharmacological effects of kratom have been studied, and it is well-established that kratom acts on the same mu-opioid receptors in the brain as traditional opioids do.  Further, there are widespread reports in the medical literature and studies of other addiction and dependency issues.

93.     Defendants therefore knew or should have known that kratom users can develop an addiction, especially if they are, as Defendants represent, "the longest-running [and] most -trusted commercial Kratom company in the U.S."[45]  Yet, Defendants fail to disclose this material fact in their advertisements or on the Products' packaging.

---

## Why buy Remarkable Herbs vs. competitors?

Remarkable Herbs is the longest-running, most-trusted commercial Kratom company in the U.S., providing Kratom to more than 15,000 stores nationwide since 2001.

Remarkable Herbs offers an array of high-quality products at affordable prices. Remarkable Herbs Kratom products are sterilized for the consumer's safety. Remarkable Herbs products are labeled correctly, complying with existing and upcoming state regulations. Remarkable Herbs supports the American Kratom Association (AKA) with a percentage of its revenue.

Remarkable Herbs never adulterates its products. Remarkable Herbs does not sell to individuals, only to stores and distributors. Remarkable Herbs has high output capacity and can meet any demand. Remarkable Herbs is packaged in the U.S. under GMP compliance.

---

[45] REMARKABLE HERBS, https://remarkableherbs.com/ (last accessed May 9, 2025).

94.     The very fact that Defendants possess the capability to manufacture the Products shows that they understand the pharmacokinetic nature of kratom and the substantial risk of addiction that it poses to consumers.  Despite this, Defendants market the Products as if they are nothing more than over-the-counter supplements.  Indeed, the packaging looks more like an herbal seasoning than a dangerously strong opioid, and Defendants' glossy website and design language obfuscates the very truth that they are selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

95.     Nowhere on the packaging do Defendants mention that kratom presents the same addiction risks or problems that former opioid users and any other consumers would want to avoid.  Consumers seeking help as they come off opioids may be drawn in by Defendants' misleading statements about kratom without knowing that they risk trading one addiction for another.  Moreover, nowhere on the packaging is any statement that the Products may be harmful to a consumer's health.  Representative images of Defendants' Products are below.





96.     As a kratom product seller, manufacturer and/or distributor, Defendants occupy a position of superior knowledge to the average reasonable consumer, who likely knows nothing about kratom.

97.     Defendants' boilerplate disclaimer is plainly insufficient.  This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

53.     Indeed, the Commonwealth of Virginia requires more.  Specifically, the packaging must have a disclaimer reading: "This product **may be harmful to your health**, has not been evaluated by the FDA, and is not intended to diagnose, treat, cure, or prevent any disease."  Va. Code Ann. § 59.1-200(A)(77) (emphasis added).  Defendants do not include such a disclaimer.

54.    Addiction is a disease.  As such, Defendants' Products pose an unreasonable health hazard, and Defendants had and have a duty to disclose this fact ***on the Products' packaging.***

55.    What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.  They look as innocuous as a vitamin supplement.

56.    Defendants, through their misleading advertising and failure to disclose kratom's addictive properties on the Products' labels, relied upon the average consumer's incomplete knowledge of kratom to better sell the Products and get users addicted to them.

57.    Defendants fail to disclose kratom's addictive potential because Defendants know that it is a material fact to reasonable consumers that would influence their purchasing and consumption decisions, likely to Defendants' financial detriment.

58.    By any metric, Defendants' conduct is immoral, unethical, and contrary to Virginia public policy.

59.    The United States is currently experiencing an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosure of the Products' risks with false and misleading packaging and marketing.  That cannot—and should not—stand, at least when Defendants' conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

98.    Accordingly, because the facts concern a critical safety-related deficiency in the Products, Defendants were under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Products and to disclose the Products

are—or potentially are—addictive.  Defendants also had a duty to disclose because of their

exclusive and/or superior knowledge concerning the true nature and composition of the Products

as the owners, manufacturers, producers, marketers, and sellers of the Products.  Nonetheless,

Defendants concealed this material information.

## CLASS ALLEGATIONS

99.    Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure on behalf of himself and all other Class members, defined as follows:

> All persons nationwide who, within the applicable statute of
> limitations period, purchased Remarkable Herbs Products (the
> "Nationwide Class").

> All persons who, within the applicable statute of limitations period,
> purchased Remarkable Herbs Products while in Virginia (the
> "Virginia Subclass").

100.    Excluded from the Classes are Defendants, as well as their officers, employees,

agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers,

employees, agents or affiliates, and any judge who presides over this action.  Plaintiff reserves

the right to expand, limit, modify, or amend these Class definitions, including the addition of one

or more subclasses, in connection with their motion for Class certification, or at any other time,

based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

101.    *Numerosity*: The members of the Classes are so numerous that joinder of all

members is impracticable.  Plaintiff is informed and believes that the proposed Classes contain at

least thousands of consumers throughout Virginia and the United States who have been damaged

by Defendants' conduct as alleged herein.  The precise number of members of the Classes is

unknown to Plaintiff at this time.

102. ***Existence and Predominance of Common Questions of Law and Fact***:  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

      a.   whether the labels on Defendants' Products have the capacity to mislead reasonable consumers;

      b.   whether Defendants knew that kratom is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

      c.   whether Defendants had a duty to disclose that kratom is addictive on the Products' packaging;

      d.   whether Defendants' conduct alleged herein violated the VCPA;

      e.   whether Defendants' conduct alleged herein constitutes unjust enrichment;

      f.   whether Defendants' conduct constitutes a fraudulent omission;

      g.   whether Plaintiff and the Classes are entitled to damages and/or restitution; and

      h.   whether an injunction is necessary to prevent Defendants from continuing to sell the Products without warning labels of their addictiveness or risk thereof.

103. ***Typicality***: Plaintiff's claims are typical of the claims of the Classes in that Plaintiff and the Class members sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiff and all others similarly situated that the Products are highly addictive, or pose a risk thereof, and are akin to opioids.

104. ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the members of the Classes.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no antagonistic or adverse interests to those of the Classes.

105.    ***Superiority***: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

106.    Defendants have acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

107.    Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiff, members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of its wrongdoing.

108.    Based on the forgoing allegations, Plaintiff's claims for relief include those set forth below.

## CAUSES OF ACTION

### COUNT I
**Violation of the Virginia Consumer Protection Act ("VCPA")**
**Va. Code Ann. § 59.1-196, *et seq.***
**(On Behalf of the Virginia Subclass)**

109.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs.

110.    Plaintiff brings this cause of action individually and on behalf of the members of the proposed Virginia Subclass against Defendants.

111.    Under the VCPA, Plaintiff, members of the Virginia Subclass, and Defendants are all "persons" within the meaning of Va. Code Ann. § 59.1-198.

112.    The Products are "goods" within the meaning of Va. Code Ann. § 59.1-198.

113.    The Products are "kratom" within the meaning of Va. Code Ann § 59.1-200(77) because they are derived from "any part of the leaf of the plant Mitragyna speciosa or any extract thereof."

114.    Defendants were, and are, engaged in "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

115.    The VCPA prohibits "fraudulent acts or practices committed by a supplier in connection with a consumer transaction[.]"  Va. Code Ann. § 59.1-200(A).

116.    Defendants' Products pose an unreasonable health hazard because kratom is highly addictive and may induce serious withdrawal symptoms.  Accordingly, Defendants had a duty to consumers to disclose on the Products' labels that the Products pose a risk of physical and psychological dependence.

117.    Defendants owed Plaintiff and members of the Virginia Subclass a duty to disclose the true safety of the Products and the failure to do so violates the VCPA.  Specifically, in marketing, offering for sale, and selling the Products without warning of their extremely addictive nature, Defendants engaged in the following unfair or deceptive acts or practices prohibited by the VCPA:

(a)    Representing that the Products have characteristics that they do not have;

(b)    Representing that the Products are of a particular standard and quality when they are not;

(c)    Advertising the Products with the intent not to sell them as advertised;

(d)    Selling addictive substances to unsuspecting consumers and profiting from their addiction;

(e)    Engaging in any other deception, fraud, false pretense, false promise, or misrepresentation that had the tendency to mislead consumers; and

(f)    Selling kratom that does not include the following disclaimer: "This product may be harmful to your health, has not been evaluated by the FDA, and is not intended to diagnose, treat, cure, or prevent any disease."

Va. Code Ann. §§ 59.1-200 (A) (5), (6), (8), (14), and (77).

118.    Defendants have known of the addictive nature of the Products and failed to disclose and actively concealed the dangers and risks posed by the Products.

119.    Defendants disseminated uniform advertising regarding the Products to and across the Commonwealth of Virginia.  This advertising was, by its very nature, unfair, deceptive, untrue, and misleading.  Such advertisements were intended to, and likely did, deceive the consuming public for the reasons detailed herein.

120.    By failing to disclose and by actively concealing the addictive nature of the Products, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair and deceptive business practices in violation of the VCPA.  Defendants deliberately withheld the information about the propensity of the addictive nature of the Products.

121.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression to consumers, were likely to and did, in fact, deceive reasonable consumers, including the members of the Virginia Subclass, about the true safety of the Products, the quality of the Products, and the true value of the Products.

122.    Defendants intentionally and knowingly misrepresented, concealed, suppressed, and omitted facts regarding the addictive nature of the Products with the intent to mislead Plaintiff and members of the Virginia Subclass.  Defendants knew, or should have known, that the Products were extremely addictive because Defendants have exclusive or superior knowledge

of kratom's addictive nature, which was not known to Plaintiff or the Virginia Subclass

members.

123.    Defendants knew, or should have known, that their conduct violated the VCPA.

124.    Plaintiff and Members of the Virginia Subclass relied on Defendants'

representations and were induced to purchase the Products and as such suffered ascertainable

loss caused by Defendants' misrepresentations and their failure to disclose material information.

Had Plaintiff and Members of the Virginia Subclass been aware of the addictive nature of the

Products, they would not have purchased them at all.  Such injury is substantial and is not

outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to

consumers or competition results from Defendants' conduct.  Since consumers reasonably rely

on Defendants' labels, and thus also Defendants omissions, consumers themselves could not

have reasonably avoided such injury.

125.    Plaintiff and Members of the Virginia Subclass did not receive the benefit of their

bargain because of Defendants' misconduct.

126.    Defendants' conduct was willful and in knowing violation of the VCPA, entitling

Plaintiff to enhanced damages, including statutory damages, attorney's fees, and costs pursuant

to Va. Code Ann. § 59.1-204.

127.    Pursuant to VA. Code Ann. § 59.1-204(A)-(B), Plaintiff and Members of the

Virginia Subclass seek:

    (a)    An award of actual damages or statutory damages of $500 per violation, whichever is greater, pursuant to Va. Code Ann. § 59.1-204;

    (b)    An award of treble damages upon a finding of willful violations;

    (c)    An award of reasonable attorney's fees and costs;

    (d)    A declaration that Defendants' practices violate the Virginia Consumer

Protection Act;

(e)    Injunctive relief prohibiting Defendants from engaging in further false and misleading advertising; and

(f)    Such other and further relief as the Court deems just and proper.

## COUNT II
**Breach of Implied Warranty**
**(On Behalf of the Nationwide Class and Virginia Subclass)**

128.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

129.    Plaintiff brings this claim individually and on behalf of the Nationwide Class and Virginia Subclass against Defendants.

130.    Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers of the Products, impliedly warranted that kratom is not addictive and does not cause opioid-like withdrawal symptoms because they did not provide disclosure on the Product's packaging stating otherwise.

131.    Defendants breached the warranty implied in the contract for the sale of their Products because the Products could not pass without objection in the trade under the contract description: the Products were not adequately contained, packaged, and labeled as per Defendants' contract with Plaintiff and the Members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive, are not potentially addictive, and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiff and the Members of the Classes did not receive the goods as impliedly warranted by Defendants to be merchantable.

132.    Plaintiff and the Members of the Classes purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

133.    The Products were defective when they left Defendants' exclusive control.

134.    Plaintiff and the Members of the Classes did not receive the goods as warranted.

135.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and the Members of the Classes have been injured and harmed because (i) they would not have purchased the Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendants.

### COUNT III
### Unjust Enrichment
### (On Behalf of the Nationwide Class and Virginia Subclass)

136.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully stated herein.

137.    Plaintiff brings this claim individually and on behalf of the Members of the Classes against Defendants.

138.    Plaintiff and the Members of the Classes conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money Plaintiff and Members of the Classes paid to Defendants.

139.    Defendants had an appreciation or knowledge of the benefit conferred on them by Plaintiff and the Members of the Classes.

140.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and the Members of the Classes' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendants failed to disclose on the Products' packaging that the Products were addictive, or were potentially addictive, and similar to opioids.  This caused injuries to Plaintiff and the Members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

141.    Defendants accepted and retained the benefit in the amount of the gross revenues they derived from sales of the Products to Plaintiff and the Members of the Classes.

142.    Defendants have thereby profited by retaining the benefit under circumstances that would make it unjust for Defendants to retain the benefit.

143.    Plaintiff and the Members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendants' sale of the Products.

144.    As a direct and proximate result of Defendants' actions, Plaintiff and the Members of the Classes have suffered in an amount to be proven at trial.

145.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

146.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place he would have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

<u>**COUNT IV**</u>
**Fraud by Omission**
**(On Behalf of the Nationwide Class and Virginia Subclass)**

147.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

148.    Plaintiff brings this claim individually and on behalf of the Members of the Classes against Defendants.

149.    Defendants distributed the Products throughout the United States, including within the Commonwealth of Virginia.

41

150.    Defendants misrepresented that the Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive, or is potentially addictive, and can cause opioid-like withdrawal.

151.    Defendants know that knowledge of kratom's addictive nature, or even potentially addictive nature is a material fact that would influence the purchasing decisions of reasonable consumers because addiction is an unreasonable health hazard.

152.    Defendants therefore had a duty to Plaintiff and to the Members of the Classes to disclose that kratom is addictive, or has a risk of being addictive, and can cause withdrawals on the Products' packaging.

153.    Consumers reasonably and justifiably relied on Defendants' omissions, because it is reasonable to assume that a product that is addictive, or has a risk of being addictive, like an opioid, would bear a warning on its packaging.

154.    As a result of Defendants' omissions, Plaintiff and the Members of the Classes paid for Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about kratom.

### COUNT V
### Common Law Civil Conspiracy
### (On Behalf of the Nationwide Class and Virginia Subclass)

155.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

156.    Plaintiff brings this claim individually and on behalf of the Members of the Classes against Defendants Peyton Palaio, Mark Reilly, and Mark Jennings.

157.    Upon information and belief, the Individual Defendants entered into an agreement to unlawfully mislead consumers into believing that the Products are not addictive when they actually are, in order to maximize their profits and line their pockets.

158.    In furtherance of their agreement, the Individual Defendants engaged in overt

wrongful acts, including but not limited to:

    (a)    Representing that the Products have characteristics that they do not have;

    (b)    Representing that the Products are of a particular standard and quality when they are not;

    (c)    Advertising the Products with the intent not to sell them as advertised;

    (d)    Selling addictive substances to unsuspecting consumers and profiting from their addiction; and

    (e)    Engaging in any other deception, fraud, false pretense, false promise, or misrepresentation that had the tendency to mislead consumers.

159.    These actions were made maliciously, with the intent to induce Plaintiff and the Members of the Classes into purchasing the Products and become addicted to them.

160.    As a result of Defendants' actions, Plaintiff and the Members of the Classes paid for Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about kratom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

    (a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel;

    (b)    For an order declaring that Defendants' conduct violates the causes of action referenced herein;

    (c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

    (d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

    (e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and;

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: June 26, 2025                           Respectfully submitted,

SILVERMAN THOMPSON SLUTKIN WHITE

By:    */s/ Pierce C. Murphy*
          Pierce C. Murphy, VSB No. 87842
          Silverman Thompson Slutkin & White, LLC
          400 East Pratt Street, Suite 900
          Baltimore, Maryland 21201
          Telephone: (410) 385-2225
          Facsimile: (410) 547-2432
          pmurphy@silvermanthompson.com

          *Counsel for Plaintiff*