IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

COREY TUCKER,
*individually and on behalf of*
 *all others similarly situated,*
        Plaintiffs,

v.                                                              Civil No. 3:25cv488 (DJN)

PEYTON PALAIO, *et al.*,
        Defendants.

### MEMORANDUM OPINION

This matter comes before the Court on a motion to dismiss the First Amended Complaint

(ECF No. 33 ("Motion to Dismiss" or "Mot.")) brought by Defendants Peyton Palaio, Mark D.

Reilly, and Mark Jennings  (the "Individual Defendants"), along with Defendants Skelmis, LLC

(d/b/a RH Natural Products, LLC), Tautline, LLC, FastIncense.com, LGI Holdings, LLC (d/b/a

Alphabet Wholesale),  LP IND., LLC (d/b/a Olistica Life Sciences Group, Centralized Services,

Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials (a/k/a

Cannopy Corporation)),  JOpen, LLC (d/b/a A1 Wholesale, Party Nuts, Evolutionary Organics,

Innovo Activas, American Kratom-D), Martian Sales, Inc., CAG Holdings CO, LLC (d/b/a

Companion AG), Calibre Manufacturing, LLC (f/k/a Advanced Nutrition, LLC) and FMK

Group, LLC (d/b/a Olistica Life Science Group), "John Doe Corporations 1-10" and "Other John

Doe Entities 1-10" (the "Organizational Defendants") (collectively, "Defendants").

Defendants argue that Plaintiff Corey Tucker ("Plaintiff") has failed to establish that any

Defendant, with the exception of JOpen, LLC, is subject to personal jurisdiction in this Court,

and Plaintiff's Amended Complaint (ECF No. 29 ("Am. Compl.")) thus warrants dismissal as to

those Defendants under Federal Rule of Civil Procedure 12(b)(2).  Further, Defendants assert that Plaintiff's Amended Complaint fails to state a claim against any Defendant under Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated below, the Court will DENY IN PART and GRANT IN PART Defendants' Motion to Dismiss (ECF No. 33) and ORDER limited jurisdictional discovery as to certain Defendants.

## I.    BACKGROUND

### A.    Legal Standards

The Court first turns to the legal standards governing what facts it may consider at this stage of the litigation.  As to Defendants' challenge to the plausibility of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court will accept Plaintiff's well-pleaded factual allegations as true, though the Court need not accept Plaintiff's legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Similarly, to the extent that Defendants challenge the Court's personal jurisdiction over them "on the basis only of motion papers, . . . the court must construe all relevant pleading allegations in the light most favorable to [Plaintiff], assume credibility, and draw the most favorable inferences for the existence of jurisdiction," *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989), though the Court need not consider only Plaintiff's evidence of personal jurisdiction to decide which inferences it will make.  *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993).  Rather, "where the defendant has provided evidence which denies facts essential for jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant has presented evidence." *Indus. Carbon Corp. v. Equity Auto & Equip. Leasing Corp.*, 737 F. Supp. 925, 926 (W.D. Va. 1990) (citation omitted).

The Court must also determine which documents and other extrinsic materials that it may consider in ruling on Defendants' motions. At this stage, the Court generally focuses its inquiry on the "sufficiency of allegations set forth in the complaint and the documents attached or incorporated into the complaint." *Zak v. Chelsea Therapeutics Int'l, Ltd*, 780 F.3d 597, 606 (4th Cir.2015); *see* Fed. R. Civ. P. 10(c) (explaining that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion," and that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes"). Here, Plaintiff attaches various documents to its Amended Complaint, including an internal PowerPoint presentation used in Defendants' business operations (ECF No. 29-1), news articles regarding Defendants' operations (ECF No. 29-2), business registration and shared property information for various Defendants (ECF Nos. 29-3, 29-4), a complaint for forfeiture of property filed by the United States of America against several Defendants (ECF No. 29-5), a state lawsuit brought by Defendant JOpen, LLC against a kratom powder supplier for breach of contract, among other claims (ECF No. 29-6), a bill from a supplier to an Organizational Defendant for kratom powder (ECF No. 29-7), pricing information for some of Defendants' products (ECF No. 29-8), and various transcripts of Defendants' depositions from two related cases, *Rachel McKibban v. Jopen, LLC, et al.*, Case No. 23-2-01183-08 (Wash. Super. Ct.), and *Kathleen Moller v. Martian Sales, Inc., et al.*, Case No. 2:24-cv-00228 WBV-DPC (E.D. La.) (ECF Nos. 29-9–29-14). These documents, attached and referenced throughout Plaintiff's Amended Complaint, are incorporated into the Amended Complaint by reference and may thus be considered by the Court.

Meanwhile, Defendants have attached to their Motion to Dismiss a variety of scientific articles and publications from the National Institute on Drug Abuse, the United States

3

Department of Health and Human Services and the World Health Organization (ECF Nos. 34-1–34-4) and various news articles reporting on a United States Food & Drug Administration ("FDA") pilot study on kratom, the botanical compound at issue in this litigation, (ECF Nos. 34-5, 34-6), and request the Court to take judicial notice of the research and regulatory actions discussed in these documents. (ECF No. 34 ("Memorandum in Support" or "Mem.") at 6–7.)[1] Defendants request such judicial notice "to establish Defendants' knowledge about the addictive qualities of kratom during the relevant period." (*Id.* at 7.)[2]

Under Federal Rule of Evidence 201, a trial court may take judicial notice of facts on its own accord and must take judicial notice of facts "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). A fact is appropriate for judicial notice if it is "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice should not "be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters." *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 360 (4th Cir. 2013) (citations omitted).

---

[1]    The Court employs the pagination assigned to all documents by the CM/ECF docketing system.

[2]    Defendants also attach various declarations made on behalf of Organizational Defendants to their Motion to Dismiss. (ECF Nos. 34-7–34-15.) Because the Court may consider evidence offered by Defendant when considering whether it retains personal jurisdiction over Defendants, *Indus. Carbon Corp.*, 737 F. Supp. at 926, the Court considers the facts alleged in those declarations for its jurisdictional analysis only.

Whether Defendants had actual knowledge as to kratom's addictive qualities at all relevant times alleged in Plaintiff's Amended Complaint constitutes a disputed question of fact that cannot be resolved at the 12(b)(6) stage, where all well-pleaded factual allegations in Plaintiff's Amended Complaint must be accepted as true, *Iqbal*, 556 U.S. at 678, and where the Court must draw all reasonable inferences in Plaintiff's favor. *Tobey v. Jones,* 706 F.3d 379, 383 (4th Cir. 2013). The Court therefore refrains from taking judicial notice of Defendants' scientific literature and news articles.

Against this backdrop, the Court accepts the following facts as pleaded in Plaintiff's Amended Complaint.

### B. Factual Allegations

#### 1. Kratom

Kratom is a substance derived from the leaves of *mitragyna speciosa* (the "kratom plant"), a plant indigenous to Southeast Asia. (Am. Compl. ¶ 30.) Residents of Thailand, Indonesia and Malaysia historically have used kratom as an herbal medicine to provide a "stimulant effect during hard-day labor" or an "analgesic or relaxing effect". (*Id.* ¶¶ 30, 32.) Scientific literature from the mid-1800s records Malaysian use of kratom as a substitute for opium. (*Id.* ¶ 30.) Today, the leaves of the kratom plant are harvested, dried and crushed into a fine powder that is subsequently packed into pouches, capsules or liquid "extract shots" for human consumption. (*Id.* ¶ 34; *id.* at 29 n.17.) Kratom products are marketed as natural supplements that can be used as a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, a focus supplement or an energy supplement. (*Id.* ¶¶ 33, 54.)

Plaintiff alleges that, despite how it is marketed, health care professionals consider kratom similar to an opioid in both its addictive properties and health effects. (*Id.* ¶¶ 37, 42, 41.) When ingested, kratom releases chemicals called alkaloids, two of which, mitragynine and 7-Hydroxymitragynine, can cause a wide variety of neurological effects. (*Id.* ¶¶ 35–37.) These two alkaloids have been shown to interact with adrenaline, dopamine and serotonin receptors in the brain, leading to mood-lifting and stimulant effects when administered in small doses. (*Id.* ¶ 37.) Notably, when ingested in substantial doses, kratom's alkaloids also interact with the mu-opioid receptor in the brain and produce "habit-forming effects" such as euphoria, sedation and pain relief — "the classic opiate high." (*Id.* ¶¶ 39, 40.) Plaintiff alleges that while "kratom's high is not overwhelming like it would be for a 'hard' drug like cocaine or heroin . . . its effects are nonetheless substantially similar to opiate-based painkillers such as hydrocodone and oxycodone in sufficient dosages." (*Id.* ¶ 37.) Plaintiff alleges that kratom carries a high risk of addiction, like any other opioid, because "[o]ver time, the user develops a tolerance to the drug, requiring increased dosages to get the same effects as a lower dose used to have." (*Id.* ¶¶ 43, 44.) When users stop taking the substance, they experience severe withdrawal symptoms "which users feel compelled to avoid by taking more of the drug." (*Id.* ¶ 45.)

Plaintiff alleges that consumers remain initially unaware of kratom's addictive properties, because "kratom does not produce as extreme of a 'high' as cocaine or heroin, [and] it is easy for users to take kratom daily without realizing they are developing an addiction and harming themselves," rendering the substance "particularly insidious as addiction sneaks up on unsuspecting and uninformed users." (*Id.* ¶ 55.) Further, many individuals take kratom in the hope that it will treat their opioid withdrawal symptoms. (*Id.* ¶ 33.) Plaintiff alleges that former opioid users in particular, "seeking help as they come off opioids[,] may be drawn in . . . without

6

knowing that they risk trading one addiction for another." (*Id.* ¶ 121.) Once kratom users have become addicted, they often do not attribute signs of addiction to kratom, but rather "take more of the substance thinking that it is helping them with their malaise." (*Id.* ¶ 59.) Yet, when kratom is used repeatedly, it itself triggers addiction and opioid withdrawal symptoms that cause users to feel "as though, over time, the color has been sapped from their lives." (*Id.* ¶¶ 42, 48.) The symptoms of kratom withdrawal mirror those of opiate withdrawal, including "irritability, anxiety, difficulty concentrating, depression, sleep disturbance . . . tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme dysphoria and malaise." (*Id.* ¶ 46.) Eventually, users "find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement." (*Id.* ¶ 56.)

Considering the health risks caused by using kratom repeatedly and in high doses, the FDA has "warned consumers not to use kratom because of the risk of serious adverse events, including liver toxicity, seizures, and substance use disorder." (*Id.* ¶ 49 (quoting FDA, *FDA and Kratom* (content current as of: Sept. 25, 2025), https://www.fda.gov/news events/public-health-focus/fda-and-kratom.).) The FDA has observed cases that met certain criteria for substance use disorder, such as when individuals used kratom for longer than intended, used more kratom than intended, experienced cravings for kratom, used kratom despite adverse consequences, became tolerant to higher levels of kratom (and subsequently increased the amounts that they consumed), and experienced withdrawal symptoms. (*Id.* ¶ 50.) The FDA has partnered with United States Customs and Border Protection and the United States Department of Justice to "limit the sale of unlawful kratom products in the U.S.," and to warn consumers about its risks. (*Id.* ¶ 51 (quoting FDA, *FDA and Kratom* (content current as of: Sept. 25, 2025), https://www.fda.gov/news

7

events/public-health-focus/fda-and-kratom.).) In addition, the FDA has taken actions against companies "selling unapproved kratom drug products, making false or misleading claims about unproven benefits of kratom, and selling unlawfully marketed kratom dietary supplements and conventional foods." (*Id.*) Currently, no legal prescription or over-the-counter drug products in the United States contain kratom or its known alkaloids. (*Id.* ¶ 49.)

Despite federal regulators' concerns about its safety, kratom comprises a $1.5 billion dollar per year industry, with 11–15 million annual users in the United States as of 2023. (*Id.* ¶ 52.) That success stems, in part, from kratom's wide availability, marketing portraying kratom products as safe, positive media attention, and consumers' lack of awareness concerning its opioid-like characteristics. (*Id.* ¶ 53.) Companies selling kratom emphasize these purported benefits, but they do not disclose the corresponding harms of kratom use. (*Id.* ¶ 54.)

### 2.    The Parties

Plaintiff Corey Tucker is a citizen of Richmond, Virginia, who suffered chronic back pain caused by a car accident. (*Id.* ¶ 8.) He began looking for "alternative pain management," such as herbal remedies, because he did not want to become addicted to any pain medications. (*Id.*) Plaintiff first purchased Defendants' products during 2022 from a smoke shop in Virginia, and he relied upon the products' packaging, which did not contain any warnings that kratom could cause addiction, to make his purchase. (*Id.*) He continued to use kratom "with no realization [that] he had an addiction until he attempted to use less of the Product." (*Id.*) When he attempted to take a lower dose of kratom, Plaintiff suffered "severe withdrawal symptoms," including fever, insomnia and restless leg syndrome, which caused him to seek medical attention on multiple occasions. (*Id.*) Plaintiff alleges that due to his addiction, he is still using kratom, even though he wishes to stop. (*Id.*) Plaintiff further asserts that, "[h]ad he known that

Defendants' Products were highly addictive, by way of a warning on the Products' packaging, he would have never purchased the Products." (*Id.*)

Plaintiff brings this class action suit on behalf of himself and (1) all persons nationwide who, within the applicable statute of limitations period, purchased Remarkable Herbs Products (the "Nationwide Class") and (2) all persons who, within the applicable statute of limitations period, purchased Remarkable Herbs Products while in Virginia (the "Virginia Subclass"). (*Id.* ¶ 132.)[3]

According to Plaintiff, Individual Defendants Peyton Palaio, Mark Jennings and Mark Reilly are residents of Georgia who have formed a wide-ranging web of corporate entities to distribute kratom products. (*Id.* ¶¶ 9–11, 191.) Defendants Palaio and Reilly purportedly began producing kratom in 2012 after facing law enforcement actions against their synthetic cannabis business, which they ran using two corporations named Omerta Labs, LLC and Lunar Labs, LLC, both of which were located at the same address: 1880 West Oak Parkway, Suite 214 in Marietta, Georgia.[4] (*Id.* ¶¶ 62, 63, 64.) Palaio and Reilly subsequently formed what Plaintiff terms "the Kratom Enterprise" or the "OPMS/Remarkable Herbs entities."[5] (*Id.* ¶¶ 68, 100.)

---

[3]    Plaintiff alleges numerosity, commonality and typicality, and asserts that he will adequately represent and protect the interests of the Nationwide Class and Virginia Subclass. (*Id.* ¶¶ 134–38.) Plaintiff further alleges that a class action proves superior to any other method for fair and efficient adjudication of this case, and that any injunctive relief would apply generally to the Nationwide Class and Virginia Subclass. (*Id.* ¶¶ 139–41.)

[4]    That address also constitutes the shipping address listed for Innovo Activas and American Kratom-D, two aliases for Defendant JOpen, LLC. (Am. Compl. ¶ 81.)

[5]    Plaintiff uses the brand names Remarkable Herbs, OPMS and Whole Herbs interchangeably, because "Remarkable Herbs is a sub-brand wholly owned and operated by the same group of individuals and shell companies (i.e., Defendants) which also manufacture, label and sell OPMS kratom" and Whole Herbs products. (*Id.* at 22, n. 23; *id.* ¶¶ 14 n. 4, 98 n. 53.)

9

Palaio, Reilly and other associates, including Defendant Mark Jennings, formed this interconnected web of corporations "responsible for various aspects of growing, importing, designing, manufacturing, testing, processing, labeling, packaging, shipping, marketing, and selling" kratom under the brand names "OPMS," "Remarkable Herbs"[6] and "Whole Herbs." (*Id.* ¶ 2.) Plaintiff alleges that Defendants Palaio, Jennings and Reilly employ "a web of shell companies, alter egos, business names, assumed names, and trade names to obfuscate the immense scope of their operation and dodge liability for their actions with the Kratom Enterprise." (*Id.* ¶ 5.)

### 3.    Defendants' Improper Marketing of Kratom

Plaintiff alleges that Defendants manufacture kratom in a "highly specialized lab" and retain "highly technical knowledge" about kratom to manufacture their products. (*Id.* ¶ 116.) Based on this knowledge, Defendants are purportedly "acutely aware of the addiction risks posed by kratom." (*Id.* ¶ 116.) Plaintiff's central allegation is that Defendants have actively misled consumers by (1) failing to disclose kratom's addictive properties and (2) falsely marketing their products as supplements or "herbal seasoning," which "obfuscates the very truth that they are selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products." (*Id.* ¶¶ 117, 119–21.)[7]

---

[6]    Remarkable Herbs has "provid[ed] Kratom to more than 15,000 stores nationwide since 2001." (*Id.* ¶ 119 (quoting REMARKABLE HERBS, https://remarkableherbs.com/ (last accessed May 9, 2025).)

[7]    Plaintiff alleges that Defendants have promulgated false, misleading, deceptive and negligent sales practices regarding all of their Remarkable Herbs kratom products, including powders and capsule products, manufactured with varying kratom strains: "Bali Kratom," "Indo Kratom," "Maeng Da Kratom," "Malaysian Kratom," "Thai Kratom" and "Vietnam Kratom." (Am. Compl. ¶ 1.)
Plaintiff attaches photos of one of Defendants' kratom products, "Maeng Da Kratom." (*Id.* ¶ 121.) These photos indicate that the back of the package contains a warning to consumers

10

### B.     Plaintiff's Amended Complaint

On November 3, 2025, Plaintiff filed his First Amended Class Action Complaint, which brings five Counts against Individual and Organizational Defendants alike (ECF No. 29). Counts I through IV are brought against all Defendants.  Count I, brought only on behalf of the Virginia Subclass, asserts that Defendants willfully and knowingly violated the Virginia Consumer Protection Act (Va. Code §§ 59.1-196, *et seq.* ("VCPA")), by engaging in unfair and deceptive acts and practices and omitting material facts when advertising their kratom products.  (*Id.* ¶¶ 143–61 ("Count I").)  Plaintiff brings three common law counts on behalf of both classes against all Defendants:  breach of implied warranty;  (*Id.* ¶¶ 162–69 ("Count II")), unjust enrichment (*id.* ¶¶ 170–80 ("Count III")) and fraud by omission for failing to disclose kratom's addictive potential and side effects.  (*Id.* ¶¶ 181–88 ("Count IV").)  Count V, brought on behalf of both classes against only Individual Defendants Palaio, Reilly and Jennings, alleges that these Individual Defendants participated in a common law civil conspiracy to defraud consumers, including by (1) "[r]epresenting that the Products have characteristics that they do not have"; (2) "[r]epresenting that the Products are of a particular standard and quality when they are not"; (3) "[a]dvertising the Products with the intent not to sell them as advertised"; (4) "[s]elling addictive substances to unsuspecting consumers and profiting from their addiction"; and (5) "[e]ngaging in any other deception, fraud, false pretense, false promise, or misrepresentation that had the tendency to mislead consumers." (*Id.* ¶¶ 189–94 ("Count V").)

---

that reads:  "Do not use product before reading product insert, labels, warnings, directions, disclaimers, and agreeing to terms & conditions, and notices." (*Id.* ¶ 121.)  It also directs consumers to "[c]onsult your healthcare professional to determine if this product is right for you, and if so, how to use it safely." (*Id.*)  Finally, it contains two disclaimers relevant here:  (1) "These statements have not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease" and (2) "NOT FOR SALE TO MINORS!  21+ ONLY.  Keep out of reach of children." (*Id.*)

11

Based upon the foregoing claims, Plaintiff seeks the following relief: class certification; a declaratory judgment that Defendants' conduct violates the law; compensatory, statutory and punitive damages; prejudgment interest on any amounts awarded; restitution "and all other forms of equitable monetary relief"; injunctive relief; attorneys' fees, expenses and or costs; and any other relief the Court deems proper. (*Id.* at 52.)

### C.    Defendants' Motion

Defendants filed the instant Motion to Dismiss Plaintiff's Amended Complaint on December 8, 2025 (ECF No. 33). All Defendants except for JOpen, LLC move for dismissal of Plaintiff's claims for lack of personal jurisdiction pursuant to Rule 12(b)(2). (*Id.* at 1.) All Defendants also move to dismiss all of Plaintiff's claims against them for failure to state a claim under Rule 12(b)(6). (*Id.* at 1–2.) Plaintiff timely responded. (ECF No. 35 ("Opp.").) Defendants timely submitted their Reply, (ECF No. 36 ("Reply")), rendering their Motion ripe for judicial review.

## II.    ANALYSIS

### A.    Defendants' 12(b)(2) Motion

The Court first turns to Defendants' Motion to Dismiss pursuant to Rule 12(b)(2), filed on behalf of all Defendants except for Defendant JOpen, LLC ("JOpen"). JOpen concedes that it is subject to this Court's personal jurisdiction. (Mem. at 2.) Thus, for the purposes of the Court's 12(b)(2) analysis, the Court only analyzes its personal jurisdiction as to the remaining Defendants, whom it terms "Remaining Defendants." Remaining Defendants argue that they have no contacts whatsoever with Virginia, and that this Court thus lacks personal jurisdiction over them. (Mem. at 11.)

12

### 1.    Legal Standard

A motion made pursuant to Fed. R. Civ. P. 12(b)(2) challenges a court's exercise of personal jurisdiction over a defendant. "When a court's personal jurisdiction is properly challenged . . . the jurisdictional question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Labs.,* 2 F.3d at 59–60 (citations omitted). When, as here, a court is asked to determine personal jurisdiction without an evidentiary hearing, it may do so based on the motion papers, supporting legal memoranda and the relevant allegations of the complaint. *Combs,* 886 F.2d at 676. If a court proceeds in this fashion, "the plaintiff need prove only a *prima facie* case of personal jurisdiction," with the court drawing "all reasonable inferences arising from the proof, and resolv[ing] all factual disputes, in the plaintiff's favor." *Mylan Labs., Inc.,* 2 F.3d at 60 (citations omitted). If the defendant provides evidence denying facts essential for jurisdiction, the plaintiff must then "present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant has presented evidence." *Pinpoint IT Servs., L.L.C. v. Atlas IT Exp. Corp.,* 812 F. Supp. 2d 710, 717 (E.D. Va. 2011). If the Court determines that Plaintiff has made a prima facie demonstration of personal jurisdiction at the 12(b)(2) stage, the Court will proceed as if it has personal jurisdiction over Remaining Defendants in this matter, although "factual determinations to the contrary may be made at trial." *Id.*

When faced with a motion pursuant to Rule 12(b)(2), the Court undertakes a two-step inquiry. First, the Court determines whether the long-arm statute of the forum state authorizes the exercise of jurisdiction over the challenging, nonresident defendant. *Carefirst of Md., Inc. v. Carefirst Pregnancy Cntrs., Inc.,* 334 F.3d 390, 396 (4th Cir. 2003). Then, the Court evaluates

13

whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the Fourteenth Amendment. *Id.* Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of the Fourteenth Amendment's Due Process Clause, "the two-prong test collapses into a single inquiry when Virginia is the forum state." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.,* 682 F.3d 292, 301 (4th Cir. 2012). Thus, the Court must decide whether Remaining Defendants "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

Within those parameters, the Court may find that it has either general or specific personal jurisdiction over a defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15 (1984). Remaining Defendants here have not subjected themselves to general jurisdiction, which exists when a defendant maintains "continuous and systematic contacts with the forum state, such that [the] defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India,* 551 F.3d 285, 292 n.15 (4th Cir. 2009) (internal quotation marks and citation omitted).[8]

Rather, the inquiry in this case turns on whether Remaining Defendants' contacts with Virginia, flowing from Plaintiff's claims, are sufficient to establish specific jurisdiction. A court

---

[8]    Although Plaintiff alleges that all Defendants "have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in this State," (Am. Compl. ¶ 28), Plaintiff does not further develop these allegations of general jurisdiction in his motions papers, instead focusing his jurisdictional arguments entirely on his alter ego and conspiracy theories of specific jurisdiction. The Court thus considers Plaintiff to have waived any allegations of general jurisdiction, and further finds that the face of the Amended Complaint disproves such a theory of jurisdiction here, where Plaintiff alleges that Remaining Defendants operate as "out-of-state actors." (*Id.* ¶ 18.)

14

may exercise specific personal jurisdiction if a defendant's minimum contacts with the forum state form the basis for the claims in question. *Mitrano v. Hawes*, 377 F.3d 402, 406–07 (4th Cir. 2004). In determining minimum contacts for specific personal jurisdiction, "a court properly focuses on the relationship among the defendant, the forum, and the litigation." *Calder v. Jones*, 465 U.S. 783, 787 (1984) (internal quotation marks and citation omitted). This analysis entails three steps, requiring trial courts to consider: "(1) the extent to which the defendant purposefully availed [it]self of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (internal quotations and citations omitted).

Even if a plaintiff submits specific and substantive allegations regarding a court's jurisdiction over a defendant, significant gaps in the record may merit limited jurisdictional discovery. *Gibbs v. Plain Green, LLC*, 331 F. Supp. 3d 518, 529 (E.D. Va. 2018). Discovery under the Federal Rules of Civil Procedure is generous in scope and freely permitted, and district courts "have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]." *Mylan Labs.*, 2 F.3d at 64.

### 2.    Plaintiff's Theories of Jurisdiction

The Court proceeds to decide whether Plaintiff has adequately alleged that Remaining Defendants have purposefully availed themselves of activities directed at Virginia, whether the exercise of personal jurisdiction would be constitutionally reasonable and whether Plaintiff's claims arise from Defendants' activities.[9]

---

[9]    The Court notes that in *Kathleen Moller v. Martian Sales, Inc., et al.*, Case No. 2:24-cv-00228 WBV-DPC ("*Moller*"), ECF No. 343 (E.D. La. March 30, 2026) (the "*Moller* Opinion"), the Eastern District of Louisiana recently addressed the same jurisdictional arguments in relation

15

Defendants argue that "Plaintiff does not plead that *any* Defendant other than JOpen has *any* contacts with Virginia," undermining Plaintiff's theory of specific personal jurisdiction. (Mem. at 11 (emphasis in original).)  In his opposition, Plaintiff seemingly concedes that point and does not further develop any allegations that any Remaining Defendant has independent contacts with Virginia.  Instead, Plaintiff argues that JOpen's contacts with Virginia should be imputed to the Remaining Defendants under two theories:  an alter ego theory and a conspiracy theory.[10]

Even though Plaintiff conflates his two theories of jurisdiction throughout his Amended Complaint, the Court construes his Amended Complaint to allege two separate theories of jurisdiction for purposes of its analysis.  Under his alter ego theory of jurisdiction, Plaintiff alleges that JOpen constitutes the hub through which Defendants fund and operate the inner workings of the Kratom Enterprise, that the Remaining Defendants are nothing more than its alter egos and that accordingly, it would be unjust to treat them differently for purposes of

---

to at least four of the ten Organizational Defendants involved in the instant case (namely, JOpen, LP IND., LLC, Martian Sales, Inc. and Calibre Manufacturing, LLC).  Here, Plaintiff repeats the jurisdictional arguments proffered by the *Moller* Plaintiff word for word in his Amended Complaint, further supporting the Court's consideration of the findings of the *Moller* Opinion. *Compare* Am. Compl. ¶¶ 95–104 *with Moller*, ECF No. 132 at 19–23.

This Court takes judicial notice of certain relevant and unsealed facts set out by the *Moller* Court regarding the corporate citizenship and relationships between the aforementioned Organizational Defendants, as a matter of public record.  The Court cites to the opinion of the *Moller* Court, rather than the underlying record, when judicially noticing such facts.

[10]   Plaintiff briefly mentions a variety of other theories of jurisdiction in his Amended Complaint, including a stream of commerce theory and a "single business enterprise, integrated employer, amalgamation, [or] joint adventure . . . all of which are equitable theories for setting aside the corporate form." (Am. Compl. ¶¶ 102, 108.)  The parties do not further brief these theories of jurisdiction, neither in Defendants' Motion to Dismiss nor in Plaintiff's responsive filing.  Since the Court concludes that the alter ego theory of jurisdiction and the conspiracy theory of jurisdiction are both applicable here, the Court need not further address any of these additional theories of jurisdiction.

jurisdiction. (Am. Compl. ¶¶ 5, 79, 99, 102, 104, 105.)  Under Plaintiff's conspiracy theory of personal jurisdiction, Plaintiff alleges that Remaining Defendants conspire with JOpen to distribute their products with false and misleading labels across Virginia.  (*Id.* ¶¶ 18, 112, 114.) Plaintiff requests jurisdictional discovery to the extent that the Court finds that it lacks facts sufficient to determine either theory of jurisdiction.  (Opp. at 15.)

First, the Court addresses Plaintiff's alter ego theory, limiting its analysis to only those Remaining Defendants that constitute corporate or unincorporated business entities (the "Remaining Organizational Defendants").[11]  For the reasons set forth below, the Court finds that Defendants Martian Sales, Inc., LGI Holdings, LLC, Calibre Manufacturing, LLC and LP IND, LLC all constitute alter egos of JOpen, meriting the piercing of the corporate veil as to those Defendants for purposes of personal jurisdiction.  The Court further orders the parties to conduct jurisdictional discovery as to Defendants Skelmis, LLC, Tautline, LLC, FMK Group, LLC, CAG Holdings CO, LLC, and FastIncense.com, as significant gaps exist in the record prohibiting the Court from understanding those entities' purported role in the Kratom Enterprise or the extent to which they constitute alter egos of JOpen.

Next, the Court turns to Plaintiff's conspiracy theory of jurisdiction.  The Court construes Plaintiff to argue that Remaining Defendants are subject to the Court's specific jurisdiction, because they conspired with JOpen to market and distribute Defendants' products without

---

[11]    Plaintiff asserts that all Remaining Defendants should be haled into court as the alter egos of JOpen, which sources and sustains them as part of the Kratom Enterprise, rendering Defendants "one single entity, co-dependent and singularly funded." (*Id.* at 13.)  However, no party provides any allegations — much less any evidentiary basis — as to the ownership structure of the so-called Kratom Enterprise.  As such, the Court stands unable to determine whether the Individual Defendants are owners, shareholders, or members of the Organizational Defendants, and thus cannot determine whether imposing alter ego jurisdictional principles on Individual Defendants would be appropriate.  Thus, the Court proceeds with its alter ego analysis as to the Organizational Defendants alone.

sufficient warnings in Virginia. (Am. Compl. ¶¶ 18; 112.) Plaintiff again does not distinguish between Organizational and Individual Defendants when levying this theory of jurisdiction. However, Plaintiff brings his common law civil conspiracy claim against only the Individual Defendants. (*Id.* ¶ 190.) Because Plaintiff offers allegations of conspiracy only against the Individual Defendants, the Court limits its analysis of personal jurisdiction based on Plaintiff's conspiracy theory to the Individual Defendants alone. It ultimately finds that JOpen's contacts with Virginia should be imputed to Individual Defendants, because Plaintiff has sufficiently established that Individual Defendants committed acts in furtherance of a conspiracy with JOpen.

### a.    Alter Ego Theory

#### i.    Threshold Issues

Before analyzing whether Plaintiff has met his prima facie burden of establishing specific personal jurisdiction over the Remaining Organizational Defendants based on his alter ego theory, the Court must determine the appropriate state substantive law to apply in its alter ego analysis, which would require it to pierce the corporate veil between JOpen and its purported alter egos. Under Federal Rule of Civil Procedure 4(k)(1), "the jurisdiction of federal courts is determined by the jurisdictional laws of the forum state." *Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 477 (E.D. Va. 2002). Based on this language, along with the forum state's interest in the jurisdictional reach of its own courts, this Court has previously found that when Virginia constitutes the forum state of a federal lawsuit brought against an out-of-state company, Virginia law governs the question of "whether personal jurisdiction over a person who controls a company can be obtained by piercing the company's veil." *Id.; see Virginia Elec. & Power Co. v. Peters*, 2018 WL 1995523, at *2 (E.D. Va. Apr. 27, 2018)("Virginia law dictates whether [an individual] acted as [a

18

Defendant company's] alter ego for the purpose of establishing jurisdiction.") In other words, the forum state, rather than the domiciliary state of the out-of-state corporation, has the greatest interest in the jurisdictional reach of the forum state's courts, and thus the law of the forum state governs a court's personal jurisdiction analysis based on an alter ego theory. *Int'l Bancorp,* 192 F. Supp. 2d at 477.[12] As this Court stated, "It is . . . sensible that piercing the corporate veil should be a permissible means of conferring jurisdiction in a forum over the alter ego of a company that is subject to jurisdiction in the forum, especially where, as here, the record reflects that . . . the alleged alter ego[] directed the acts of the plaintiff [and counter-defendant] companies that are in issue, namely registering domain names, creating websites, and filing this action." *Id.* For these reasons, the Court will apply Virginia law to its alter ego jurisdictional analysis.

### ii.    Analysis

The Court now turns to resolving whether the actions of JOpen can be imputed to the Remaining Organizational Defendants such that they constitute alter egos of JOpen and the Court may exercise personal jurisdiction over them. "[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual . . . that would not ordinarily be subject to personal jurisdiction in that court

---

[12]    The Court acknowledges that for purposes of determining *liability*, rather than jurisdiction, the state of the alter ego's incorporation governs the inquiry, as recognized by *Int'l Bancorp, L.L.C.,* 192 F. Supp. 2d at 477 n. 18; *see also United States v. Kolon Indus., Inc.,* 926 F. Supp. 2d 794, 815 (E.D. Va. 2013) (finding that, for purposes of liability, the law of the state of the alter ego's incorporation governed). The Court also recognizes that at least one case has applied this approach when analyzing whether to pierce the corporate veil in its *jurisdictional* analysis, but in that case, the parties agreed on the appropriate state law. *See, e.g., Transportation Dist. Comm'n of Hampton Roads v. U.S. Workboats, Inc.,* 2021 WL 12355268, at *3 (E.D. Va. June 9, 2021).

when the individual . . . is an alter ego . . . of a corporation that would be subject to personal jurisdiction in that court." *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011) (citation omitted). A court may pierce the corporate veil "to find that an [entity] is the alter ego of a corporation where it finds '(i) a unity of interest and ownership between the [entity] and the corporation, and (ii) that [the entity] used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage.'" *Id.* at 434 (cleaned up and citation omitted). In Virginia, the party seeking to pierce the corporate veil bears the burden of proof. *William v. AES Corp.*, 28 F. Supp. 3d 553, 562 (E.D. Va. 2014). Piercing the corporate veil and imposing liability on separate corporate entities acting as alter egos of another entity constitutes an "extraordinary act" permitted only when "necessary to promote justice." *C.F. Trust, Inc. v. First Flight L.P.*, 580 S.E.2d 806, 809 (Va. 2003).

In Virginia, limited liability companies stand subject to the same standard for piercing the corporate veil as do other corporate forms. *PAE Nat'l Sec. Sols., LLC v. Constellis, LLC*, 83 Va. App. 252, 270 (Va. Ct. App. 2025) (citing *C.F. Trust.*, 580 S.E.2d at 809–10); *A.G. Dillard, Inc. v. Stonehaus Constr., LLC*, 2016 WL 3213630, at *2 (Va. June 2, 2016) (noting that the same standards of corporate veil piercing apply for corporations and limited liability companies).

To pierce an entity's corporate veil for purposes of alter ego jurisdiction, a court must make a fact-intensive inquiry that requires it to closely scrutinize the factual circumstances surrounding the allegations. *Vitol, S.A. v. Primerose Shipping Co. Ltd.*, 708 F.3d 527, 544 (4th Cir. 2013). The Fourth Circuit has articulated certain factors that may be used when determining whether one entity constitutes the alter ego of another, including: gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper

20

corporate records, non-functioning of officers, control by a dominant stockholder, injustice or

fundamental unfairness, intermingling of funds, overlap in ownership, officers, directors, and

other personnel, common office space; the degrees of discretion shown by the allegedly

dominated corporation, and whether the dealings of the entities are performed at arm's length.

*Id.*[13] However, in applying the *Vitol* factors, the Court must focus "on reality and not form, on

how the corporation operated and the individual defendant's relationship to the operation." *Id.*

(citations omitted).

Applying the above principles, the Court addresses whether it has jurisdiction over each

Remaining Organizational Defendant under a veil-piercing alter ego theory.[14]

### a.      Martian Sales, Inc.

Martian Sales, Inc. ("Martian Sales") is a Wyoming corporation formed in 2012.  (ECF

No. 34-12 ¶ 3; ECF No. 29-10 at 17:16–18; Am. Compl. ¶ 19.)  Its principal place of business is

---

[13]      Although *Vitol* explained these factors in the context of admiralty jurisdiction, rather than Virginia law, this Court has used the *Vitol* factors as guidance when determining whether a corporation constitutes an alter ego of another corporation under Virginia law. *See, e.g., William*, 28 F. Supp. 3d at 561.

[14]      Before beginning its fact-specific analysis, the Court briefly dispenses with two arguments presented by Plaintiff in support of veil piercing that lack validity and therefore do not merit further discussion as to each individual Defendant.  First, to the extent that Plaintiff argues that Defendants' decision to register or incorporate their businesses in Wyoming demonstrates an intent to abuse the corporate form, (Am. Compl. ¶ 106), the Court declines to give credence to such an argument.  Plaintiff merely offers the conclusory allegation that Defendants' "intent was to hide the identity of their owners and members" by registering or incorporating in Wyoming without providing any support for this claim.  The Court is also not persuaded by Plaintiff's claim that Defendants' decision to have the same law firm represent all Defendants in this litigation demonstrates a lack of adherence to corporate formalities. (Am. Compl. ¶ 107.)  In so arguing, Plaintiff relies solely upon one case, *Glob. Plasma Sols., Inc. v. Elsevier Inc.*, 2024 WL 6789912, at *6 (W.D.N.C. May 22, 2024), *report and recommendation adopted*, 2025 WL 2060790 (W.D.N.C. July 23, 2025).  Importantly, that case proceeds under North Carolina law, which expressly provides that the Court may consider unity of counsel in veil-piercing analyses. The Court is unaware of any such precedent under Virginia law.

2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia 30066, which it shares with other named Organizational Defendants, including Defendants LP IND., LLC ("LP"); LGI Holdings, LLC ("LGI"); Calibre Manufacturing, LLC ("Calibre"); and FMK Group, LLC ("FMK"). (Am. Compl. ¶¶ 16–17, 19, 21– 22.)[15] Martian Sales holds the OPMS[16] trademark and owns the OPMS website, which JOpen uses to distribute kratom products across the U.S. (ECF No. 29-9 at 30:24-25, 52:15–19); *Moller* Opinion at 31. Martian Sales constitutes the entity that "originally designed the [kratom] product[s]" and has marketing and pricing control over Defendants' kratom products. (ECF No. 29-9 at 51:8–17.)

In approximately 2012, Defendant Palaio introduced non-defendant David Gabbay, the manager of JOpen, to Defendant Mark Reilly, the President of Martian Sales. (ECF No. 29-9 at 31:14–19; ECF No. 34-12 ¶ 2.) After Gabbay and Reilly connected, Martian Sales began selling kratom products to JOpen, which JOpen distributed. (ECF No. 29-9 at 32:16–21.) Soon, JOpen

---

[15]    The Court notes that in *Moller*, Defendants LP, LGI, Calibre, and FMK all submitted declarations indicating that they do not have "common offices, common property, common accounting systems, common directors and officers, or common employees" with Martian Sales, and Martian Sales submitted a supporting declaration affirming that statement. *See Moller* Opinion at 27, 33, 50, 52 (quoting and discussing declarations). Curiously, these Defendants have not submitted similar declarations here. Since Plaintiff alleges that Martian Sales shares addresses with LP, LGI, Calibre, and FMK, and since Defendants have not provided any evidence rebutting that assertion here, the Court — construing all facts in Plaintiff's favor, as it must — assumes that these entities share a common office as Plaintiff alleges.

[16]    As explained above, Plaintiff uses the terms OPMS, Remarkable Herbs and Whole Herbs interchangeably. *See supra*, note 5. Here, Plaintiff's allegations and the *Moller* Opinion exclusively reference OPMS products. For the purposes of Plaintiff's jurisdictional allegations, the Court construes Plaintiff to allege that Defendants collaborate to market the Remarkable Herbs and Whole Herbs products as well. (*See* Am. Compl. at 22, n. 23 (acknowledging that Plaintiff's allegations "come from reporting and research specifically regarding OPMS kratom," but arguing that "they apply with equal force here because Remarkable Herbs is merely another brand manufactured and distributed by Defendants").) When not quoting the allegations directly, the Court employs "kratom products" to refer to OPMS, Remarkable Herbs and Whole Herbs products.

22

began to assist Martian Sales with more of its regular corporate activities, including packaging Martian Sales's product, paying Martian Sales's bills and controlling Martian Sales's website. (*Id.* at ECF No. 29-9 at 32:22–34:25, ECF No. 29-10 at 20:14–21.) No documented record confirms that Martian Sales ever reimbursed JOpen for payment of its bills, and JOpen continued to do Martian Sales "favors" in order to "make whatever the customer wants, happen." (ECF No. 29-9 at 34:24, 35:19–36:9, 37:2–8, 37:22–25.) Eventually, as more money "was spent than money was coming in," Martian Sales directed JOpen to "keep on going" in its administration of Martian Sales's business. (ECF No. 29-9 at 38:5–13.)

Finally, amidst increasing pressure on its business, Martian Sales "entered into contract processing agreements and distribution agreements with" JOpen in 2020. *Moller* Opinion at 30; (ECF No. 29-9 at 36:13–15.) In 2023, JOpen and Martian Sales entered a superseding agreement. (*Id.* at 39:21–23, 40:14–18.) Pursuant to the agreement, Martian Sales supplies JOpen with kratom products. (*Id.* at 40:5–9.) JOpen retains a percentage of its sales of the kratom products to compensate itself for its "services performed by or at the direction of [JOpen] on [Martian Sales's] behalf, less all costs." (*Id.* at 40:19–41:21.) The remaining percentage of the sales revenue does not revert to Martian Sales; instead, JOpen uses those funds to pay for manufacturing, sourcing, packaging and donation costs on behalf of Martian Sales. (*Id.* at 41:25–42:14.) JOpen and Martian Sales reportedly decide together whether any amount left over after paying Martian Sales's bills should be put towards promotional campaigns or lower prices for the kratom products that JOpen distributes on behalf of Martian Sales. (*Id.* at 42:19–25.) Individual Defendant Mark Reilly, the president of Martian Sales, "get[s] paid out pretty much once a year or however [JOpen] feel[s] like paying" him based on an agreed number that has "slowly ramp[ed] up over time" based on the "amount of time" the two corporations have

23

worked together, without taking into account the sales volume of JOpen's products. (ECF No. 29-10 at 11:22–12:24.) Martian Sales does not retain liability insurance. (ECF No. 29-10 at 16:6-8.)

Based on the above facts, Plaintiff sets forth three main grounds for why JOpen's contacts with Virginia should be imputed to Martian Sales under a veil-piercing theory: Martian Sales's commingling of funds with JOpen, both entities' failure to observe corporate formalities, and Martian Sales's undercapitalization. (Am. Compl. ¶¶ 95, 96–99, 103.) Further, Plaintiff argues that Martian Sales is part of Defendants' "ever-growing and evolving web of separate corporations" that they formed "to hide their business operations and resources," thus engaging in ongoing corporate fraud that would merit piercing Martian Sales's and JOpen's corporate veil under Virginia law. (*Id.* ¶ 104.)

Defendants respond that, as to JOpen's and Martian Sales's close relationship, "[t]here is nothing wrong with a business owner dividing business operations into separate corporate entities." (Mem. at 13.) Further, Defendants assert that, because Martian Sales and JOpen operated first through an oral contract and later through a written one, their business proceedings have all been conducted through an arms-length relationship. (*Id.* at 14-15.) Finally, Defendants argue that Plaintiff's allegations of fraudulent intent are conclusory and lack merit. (*Id.* at 15.)

Mindful of its duty to construe all facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has established a prima facie case that Martian Sales constitutes JOpen's alter ego, such that JOpen's undisputed contacts with Virginia may be imputed to Martian Sales. Virginia courts require plaintiffs alleging that two entities are corporate alter egos to show that those entities "operated as a single economic entity such that it would be inequitable . . . to uphold a legal distinction between them." *Finney v. Clark Realty Cap., LLC*, 2021 WL 5195216,

24

at *2 (E.D. Va. July 20, 2021). Based on the record before it, the Court concludes that JOpen and Martian Sales operated as such a single economic entity. As the record demonstrates, the two entities' relationship evolved over eight years without a written agreement, during which period JOpen took on an increasing amount of Martian Sales's corporate responsibilities, including paying its invoices and controlling its website. JOpen appears to have paid Martian Sales's invoices as a "favor," often with no expectation of repayment, demonstrating a complete lack of adherence to corporate formalities across the two entities. Further, JOpen compensates Martian Sales's manager with a flat sum, even though Martian Sales purportedly still owes JOpen money for performing its numerous "favors." Virginia courts have found such evidence sufficient to merit piercing the corporate veil. *See, e.g., A.G. Dillard, Inc.*, 2016 WL 3213630 at *3 (piercing veil of LLC where member owed company substantial amounts of money, but the company had made no effort to collect the debt, instead providing member with financial benefits.)

Martian Sales's more formal written agreements with JOpen further demonstrate that the two entities have not maintained an arms-length business relationship. Pursuant to their current agreement, Martian Sales supplies JOpen with kratom for distribution; JOpen then uses the resulting proceeds to pay itself and Martian Sales's creditors. Importantly, no portion of the revenue returns to Martian Sales itself. Instead, Martian Sales depends on JOpen to pay its bills and fund its operation, creating a strong inference of undercapitalization.[17] JOpen does set aside

---

[17]     The Court further finds that Martian Sales's lack of insurance demonstrates undercapitalization and weighs in favor of piercing the corporate veil. *West v. Costen*, 558 F. Supp. 564, 586 (W.D. Va. 1983) (piercing the corporate veil when collections agency "maintained no reserve for contingencies"); *In re Criswell*, 52 B.R. 184, 195 (Bankr. E.D. Va. 1985) ("[U]ndercapitalization essentially means that there is insufficient unencumbered capital to reasonably meet a corporation's predictable and prospective liabilities in the event they were to arise").

25

a portion of revenue from its sales of kratom products to pay Martian Sales's manager, Mark Reilly. However, Reilly stated that JOpen pays him "whenever it feels like paying him," and his payout constitutes an agreed-upon number scaled to the length of his business relationship with JOpen and does not depend on the amount of revenue generated. (ECF No. 29-10 at 11:22–12:24.) Such an arrangement appears more like payment of an employee's salary than an independent entity paying another entity pursuant to a sale and distribution contract. Finally, as mentioned, JOpen also functionally runs Martian Sales's internal operations, including making donations on its behalf, paying its suppliers and manufacturers[18] and even controlling its website. JOpen appears to fund and perform the day-to-day operation of Martian Sales. Based on these facts, the Court concludes that Martian Sales and JOpen have failed to observe corporate formalities and have intermingled their funds.[19]

---

[18] Martian Sales is located at the same principal place of business as many of its purported suppliers and clients. *See infra* Section II.A.2.a.ii.b-e (describing Defendants' contractual relationships and shared addresses with Martian Sales.)

[19] The *Moller* Court declined to find that Martian Sales and JOpen commingled funds on a nearly identical record by concluding, without significant analysis, that JOpen's compensation of Martian Sales constituted an arm's length transaction, since both parties have competing economic interests under the 2023 distribution agreement. (*Moller* Opinion at 30.) However, the *Moller* Court did not explain what the parties' competing economic interests were, much less how the distribution agreement manifested those competing interests. Additionally, in *Moller,* Martian Sales offered rebuttal evidence attesting that it was not "under common control" and did not share common offices, property, accounting systems, directors and officers, or employees with any other Defendant in that action. (*Moller* Opinion at 27). Here, Defendants do not attempt to rebut Plaintiff's assertion that Martian Sales shares common offices with other Defendants. (Am. Compl. ¶¶ 16, 17, 19, 21, 22.) In light of Plaintiff's extensive allegations regarding Martian Sales's commingling with JOpen and Martian Sales's failure to rebut any of these allegations, and mindful of its duty to "focus on reality" rather than conclusory claims that corporate formalities have been followed, *Vitol,* 708 F.3d at 544, the Court arrives at a different conclusion than the *Moller* Court.

26

The Court also finds that Plaintiff has sufficiently established that piercing the corporate veil is necessary here to avoid injustice.  A court may pierce the corporate veil when another entity "controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Greenberg v. Commonwealth ex rel. Atty. Gen. of Virginia*, 499 S.E.2d 266, 272 (Va. 1998).  Plaintiff argues that Defendants have created many different business entities, including Martian Sales and JOpen, to "make it as difficult as possible for the [Kratom] Enterprise as a whole to be held accountable for their fraudulent conduct in courts such as this one by using their shell game to avoid jurisdiction and play 'hot-potato' with liability." (Opp. at 9; Am. Compl ¶¶ 104–06.)  Defendants do not substantively rebut that argument. (*See* Mem. at 15 (arguing that "Plaintiffs' [*sic*] allegations . . . are supported with conclusions and supposition drawn from innocuous facts" without rebutting Plaintiff's allegations.)  The Court finds that Plaintiff has plausibly alleged that JOpen functionally controls Martian Sales to obfuscate visibility into the operations of the Kratom Enterprise and avoid potential liability, in light of the factors demonstrating the two entities' intermingled relationship and the dearth of any evidence to the contrary.

In light of the aforementioned factors counseling in favor of piercing the corporate veil and Plaintiff's unrebutted allegations regarding JOpen's control over Martian Sales in order to evade liability, the Court holds that piercing the corporate veil is merited given Martian Sales and JOpen's functional unity as alter egos.

  **b.  LGI Holdings, LLC (d/b/a Alphabet Wholesale)**

LGI Holdings, LLC ("LGI") is a Wyoming limited liability company.  (Am. Compl. ¶ 16.)  Defendant Peyton Palaio manages LGI.  (ECF No. 34-10 ¶ 2.)  LGI is located at 2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia 30066 — the same office address

27

listed by Martian Sales, LP, Calibre, and FMK. (Am. Compl. ¶¶ 16, 17, 19, 21, 22.) LGI does not maintain liability insurance. (*Id.* ¶ 103.) According to Plaintiff, LGI "appears to handle kratom imports for the Kratom Enterprise." (*Id.* ¶ 16.) Although LGI orders kratom from suppliers, JOpen has paid its invoices on at least one occasion. (*Id.* ¶ 78.) LGI also goes by the name "Alphabet Wholesale," but that entity does not exist in business filings. (*Id.* ¶ 77.) Plaintiff alleges that Individual Defendant Palaio uses LGI and Alphabet Wholesale interchangeably to negotiate supply agreements and arrange for the importing of kratom products, while JOpen ultimately pays the invoices to "hide their dealings and stymie investigations into the Kratom Enterprise." (*Id.* ¶¶ 16, 77–79.)

Defendants argue that Plaintiff's own allegations demonstrate that LGI possesses a "well-delineated corporate form[]" with a unique function in the Kratom Enterprise's chain of distribution, namely, handling kratom imports. (Mem. at 14.) Defendants do not respond to Plaintiff's allegations regarding JOpen's payment of LGI's invoices, nor do they address the fact that LGI shares an office with several other Defendants beyond acknowledging that "some defendants have offices in Georgia." (*Id.* at 15.)

For the same reasons exhaustively discussed above, the Court finds that LGI constitutes JOpen's alter ego for purposes of jurisdiction. LGI shares office space with Martian Sales, itself an alter ego of JOpen. *See supra* Section II.A.2.a.ii.a. Moreover, Plaintiff alleges, and Defendant does not dispute, that Defendant JOpen pays for LGI's kratom orders — defeating its assertion that LGI and JOpen play materially different roles in the larger Kratom Enterprise and suggesting LGI's undercapitalization.[20] Similarly, Plaintiff alleges that Defendants used LGI and its alias, Alphabet Wholesale, to place kratom orders, yet those orders were paid for by

---

[20] Plaintiff also alleges that LGI lacks liability insurance, suggesting undercapitalization.

Defendant JOpen in order to obfuscate subsequent investigations into the Kratom Enterprise; this unrebutted allegation again counsels for a finding that Defendants adopted this entity structure to avoid legal accountability.

All of these factors weigh in favor of finding that LGI constitutes an alter ego of JOpen. In the absence of any rebutting facts by Defendants, the Court finds that Plaintiff has established a prima facie case allowing for JOpen's minimum contacts to be imputed to LGI.

> **c.   Calibre Manufacturing, LLC (f/k/a Advanced Nutrition, LLC)**

Calibre Manufacturing, LLC ("Calibre") is a limited liability company formed in Wyoming in 2021 and has listed its principal place of business as 2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia 30066 — again, the same Georgia address held by Defendants Martian Sales, LGI, LP, and FMK. (Am. Compl. ¶¶ 16, 17, 19, 21, 22.) Since approximately 2021, Calibre has contracted with Martian Sales to manufacture its kratom products. (ECF No. 29-9 at 48:1–2, 51:3–5.). Calibre "receives shipments of raw kratom powder at various warehouses scattered around Marietta and Alpharetta, Georgia." (Am. Compl. ¶ 83.) After receiving the powder, Calibre mills it, processes it and places it into capsules during the process of "bulk finished good production." (ECF No. 29-10 at 8:1–7; Am. Compl. ¶¶ 21, 83); *Moller* Opinion at 49. Calibre sends the "bulk kratom product" to JOpen in Texas for packaging and distribution. *Moller* Opinion at 49. JOpen purportedly pays Calibre for its processing work, although that work is performed pursuant to a contract with Martian Sales. (ECF No. 29-9 at 42:10–12 (JOpen's sales revenue pays for Martian Sales's "manufacturer and packager"); ECF No. 29-11 at 7:17–22 (Martian Sales does not pay Calibre (f/k/a Advanced Nutrition) for the processing it does for Martian Sales); Am. Compl. ¶ 99.)

The record reveals that Calibre bears many close links with other Jurisdictional Organizational Defendants, which in turn are linked to JOpen. Defendant Mark Jennings manages Calibre, along with CAG Holdings CO, LLC, LP, and FMK. (ECF No. 34-11 ¶¶ 1, 2; ECF No. 34-13 ¶¶ 1, 2; ECF No. 34-14 ¶¶ 1, 2; ECF No. 34-15 ¶¶ 1, 2.) In addition, Mark Jennings manages and draws his salary from another entity, non-defendant CC US. (ECF No. 29-13 at 6:13–14.) CC US pays Jennings to manage HR, accounting and IT services for many of the Defendants that he manages, including LP, CAG Holdings CO, LLC, and, as relevant here, Calibre itself. (ECF No. 29-13 at 8:13–23; Am. Compl. ¶ 101.) Jennings stated under oath that, as the manager of both CC US and Calibre, he "generally report[s]" to Defendant Palaio, the manager of JOpen's alter ego LGI, although he purportedly remains uncertain of the ownership structure of either CC US or Calibre. (ECF No. 29-12 at 16:19.)

Plaintiff's theory for personal jurisdiction over Calibre appears to be that Calibre constitutes an alter ego of Martian Sales and thus constitutes an alter ego of JOpen. Plaintiff points to the fact that JOpen pays manufacturing costs for Martian Sales, "such as those incurred with Calibre," as evidence that JOpen pays "whatever operational costs arise throughout the entire stream of commerce for Remarkable Herbs kratom and for non-Remarkable Herbs production work." (*Id.* ¶¶ 99, 100.) Further, Plaintiff points to the overlap between Calibre's office space, managers, and accounting services with Martian Sales, its purported customer, and with other named Defendants that similarly contract with Martian Sales but are paid by JOpen. (*Id.* ¶¶ 100, 101, 109, 110.) Finally, Plaintiff points to Calibre's lack of liability insurance as evidence of its undercapitalization. (*Id.* ¶ 103.)

Defendants again emphasize that, like LGI, Calibre possesses a "well-delineated corporate form[]" with a unique function in the Kratom Enterprise's chain of distribution of

30

kratom products, namely, handling the processing aspect of kratom production. (Mem. at 14.) Defendants offer no explanation as to why JOpen pays Calibre for the work that it performs for Martian Sales, nor do they address the fact that Calibre shares an office with a variety of the other named defendants that have similar arrangements with Martian Sales and JOpen, other than acknowledging that "some defendants have offices in Georgia." (*Id.* at 15.)

Viewing the allegations in the light most favorable to Plaintiff, the Court concludes that sufficient evidence supports a finding that Calibre constitutes an alter ego of JOpen. Calibre shares office space with Martian Sales, a purported client of Calibre and itself JOpen's alter ego. JOpen pays Calibre for services that it performs on behalf of Martian Sales. Calibre also shares office space with other Defendants who similarly contract with Martian Sales and collaborate with Calibre, yet are compensated by JOpen. (*See* ECF No. 29-9 at 12:5–6, ECF No. 29-12 at 15:1–19, 17:19–25, 18:19–25) (LP was involved in kratom extraction for non-defendant LIV Group, an entity that contracts with Martian and is paid by JOpen; LP sent bulk extract to Calibre for processing pursuant to that contract; and CAG Holdings CO operates at the same extraction site as LP). Most importantly, Calibre shares a manager with multiple Defendants, and that manager, Defendant Jennings, reports directly to Defendant Palaio, the manager of LGI, a corporation that this Court has found also constitutes an alter ego of JOpen. Finally, Calibre lacks liability insurance, suggesting undercapitalization. All these factors weigh in favor of finding that Calibre constitutes an alter ego of JOpen. *See, e.g., Transportation Dist. Comm'n of Hampton Roads,* 2021 WL 12355268, at *5 (finding that when two corporations have the same address, principal place of business and agents, and one is undercapitalized, the court can infer that one entity constitutes the alter ego of another, justifying piercing the corporate veil under Washington law, which mirrors Virginia law); *A.G. Dillard, Inc,* 2016 WL 3213630 at *3

31

(finding that a defendant controlled one entity and, in turn, controlled that entity's alter ego corporations upon evidence that the corporations did not operate as separate personalities.)

Taking all these facts together, and again noting the lack of any rebuttal evidence by Defendants, the Court finds that Plaintiff has established a prima facie case that Calibre constitutes JOpen's alter ego for purposes of jurisdiction such that JOpen's minimum contacts may be imputed to Calibre.[21]

> **d.      LP IND., LLC (d/b/a Olistica Life Sciences Group, Centralized Services, Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a Cannopy Corporation])**

LP IND., LLC (d/b/a Olistica Life Sciences Group, Centralized Services, Jordan Process, Cascade Naturals, Della Terra Pharmaceuticals, Naturea Biomaterials [a/k/a Cannopy Corporation]) ("LP") is a limited liability company first registered in 2019 in Wyoming. (ECF No. 29-12 at 14:14–25.)  LP's sole member is FMK Group, Inc., formerly known as "Olistica Life Science Group." *Moller* Opinion at 34; (Am. Compl. ¶ 22.)   LP fails to maintain liability insurance. (Am. Compl. ¶ 103.) LP is purportedly involved in "kratom farming, kratom research, and kratom extract production" for the Kratom Enterprise, and contracted with Martian Sales through a non-defendant entity, LIV Group.  (ECF No. 29-9 at 12:4–9, ECF No. 29-12 at

---

[21]      Again, the Court declines to follow the *Moller* Court's reasoning as to Calibre's connection to JOpen.  In *Moller,* the Court did not consider evidence of shared managers in its veil-piercing analysis for the defendant limited liability companies, pursuant to Wyoming Statute § 17-29-304, which prohibits a court's consideration of "factors intrinsic to the character and operation of a limited liability company." *Moller* Opinion at 36.  However, here, the Court's analysis proceeds under Virginia law, which has no such statute governing veil-piercing standards for LLCs and treats LLCs and corporations the same for jurisdictional purposes. *A.G. Dillard, Inc.*, 2016 WL 3213630 at *2.  These differences in governing law sufficiently justify a different outcome in this case.

15:4–19; Am. Compl. ¶ 17.)[22]  JOpen has paid Martian Sales's contract with LIV Group, and, presumably, with LP. (ECF No. 29-9 at 12:4–9.)

Like Calibre, LP is connected on many levels to Martian Sales and other Remaining Organizational Defendants, which in turn are connected to JOpen.  LP, like the various entities already mentioned, lists its principal place of business as 2550 Sandy Plains Road, Ste. 225, Box 319, Marietta, GA 30066. (Am. Compl. ¶ 17.)  It also purportedly operates out of an additional Colorado facility held by Defendant CAG Holdings CO, LLC.  *Moller* Opinion at 38; (ECF No. 29-12 at 15:1–2.)  Defendant Mark Jennings manages LP, along with the other entities discussed above. (ECF No. 34-11 ¶¶ 1, 2.)  And as explained above, CC US pays Defendant Jennings to provide HR, accounting and IT services to LP, along with Calibre and CAG Holdings CO, LLC. (ECF No. 29-12 at 8:12–9:2; Am. Compl. ¶ 101.)

For the same reasons provided with regard to Calibre, the Court finds that LP constitutes JOpen's alter ego: it, too, shares offices with entities directly involved in the Kratom Enterprise, it is paid by JOpen through its contract with LIV Group, its manager, Defendant Jennings, reports to Defendant Palaio, the manager of JOpen's alter ego LGI, and the evidence suggests undercapitalization. Thus, JOpen's contacts with Virginia may be imputed to LP.

---

[22]    Further, Plaintiff cites to a PowerPoint presentation, purportedly used for internal business communications within the Kratom Enterprise, that describes Olistica Life Sciences Group, one of LP's aliases, as a vital link in a network of "established international operations" in North America, Europe, South America and Asia that farm, process, manufacture, market and distribute "botanicals and natural products." (ECF No. 29-1 at 6.)  Olistica Life Sciences Group purportedly encompasses Defendant CAG Holdings CO, LLC, has several manufacturing arms, and works with a non-defendant biopharmaceutical firm known as NP BioPharma. (*Id.* at 15.)

33

e.    **CAG Holdings CO, LLC (d/b/a Companion AG)**

CAG Holdings CO, LLC (d/b/a Companion AG) ("CAG Holdings CO") is registered in Colorado with its principal place of business at 23298 US Highway 160, Springfield, Colorado 81073. (Am. Compl. ¶ 20.)  CAG Holdings CO is a "modern co-op that manages select commercial agricultural crops through an innovative, biotech-oriented, networked model." (ECF No. 29-1 at 15 (describing CAG Holdings CO's alias, Companion AG).)

Despite Plaintiff's allegations in the Amended Complaint, the Court has encountered significant challenges in attempting to ascertain whether CAG Holdings CO represents a valid entity for jurisdictional purposes.  Confusingly, Defendants submitted a declaration on behalf of CAG Holdings, LLC, rather than named Defendant CAG Holdings CO, LLC.  (ECF No. 34-13.) That declaration, sworn to by Defendant Mark Jennings, states that CAG Holdings, LLC is a "Wyoming limited liability company" and refers to the company in the present tense, implying that the entity remains active. (ECF No. 34-13 ¶ 2.)  Yet, in a declaration before the *Moller* Court mere months ago, Jennings represented that CAG Holdings, LLC is no longer in operation. *Moller* Opinion at 37.  Jennings additionally asserted that CAG Holdings, LLC had no involvement with kratom processing and instead operated a manufacturing facility that formerly processed industrial hemp. *Moller* Opinion at 37.

Given the discrepancies between Plaintiff's allegations regarding named Defendant CAG Holdings CO, LLC, purportedly registered in Colorado, and the entity that submitted a declaration in this case, CAG Holdings, LLC, purportedly registered in Wyoming, the Court cannot identify the correct business identity of named Defendant CAG Holdings CO, LLC. Further, even assuming that CAG Holdings CO, LLC does, in fact, constitute the same entity as CAG Holdings, LLC, the Court cannot verify whether that entity constitutes an existing limited

liability corporation, much less understand its role in the Kratom Enterprise, in light of Defendant Jennings' seemingly conflicting representations before this Court and the *Moller* Court.

As explained above, *supra* Section II.A.1, the Court may order limited jurisdictional discovery if necessary to resolve whether it has jurisdiction over a defendant, as long as a plaintiff has pleaded specific and substantive allegations regarding the Court's jurisdiction over that defendant. *Gibbs*, 331 F. Supp. 3d at 529. Considering Plaintiff's extensive allegations regarding Defendants' scheme to defraud consumers using a web of corporations involving CAG Holdings CO and other Organizational Defendants, the Court finds that Plaintiff has stated adequate allegations to justify limited jurisdictional discovery to supplement the existing gaps in the record. The Court thus grants Plaintiff's request for jurisdictional discovery as to CAG Holdings CO, LLC. The Court further reminds Defendant Jennings and his counsel that Jennings verified the truth and accuracy of his declaration as to CAG Holdings, LLC (ECF No. 34-13) before this Court under penalty of perjury, and that any failure to be forthright in his representations before this Court may merit sanctions as this litigation progresses.

### f.    FMK Group, LLC (d/b/a Olistica Life Science Group)

FMK Group, LLC (d/b/a Olistica Life Science Group) ("FMK") was formed in Wyoming and lists 2550 Sandy Plains Road, Suite 225 Box 319, Marietta, Georgia 30066 as its principal place of business — the same address listed by several Defendants discussed above. (Am. Compl. ¶ 22.) The Amended Complaint offers no other details regarding FMK Group, LLC, and the Court cannot ascertain if FMK Group, LLC is affiliated in any manner with FMK Group, Inc., the sole member of both Defendants LP and CAG. *Moller* Opinion at 52. On the facts presented, the Court cannot ascertain the precise role that FMK plays in the Kratom Enterprise.

35

In light of Plaintiff's general allegations of FMK's involvement in the Kratom Enterprise and the Court's broad discretion concerning matters of discovery, the Court grants Plaintiff's request for jurisdictional discovery as to FMK Group, LLC.

> **g.      Skelmis, LLC (d/b/a RH Natural Products) and Tautline, LLC**

Skelmis, LLC (d/b/a RH Natural Products) ("Skelmis") is registered in Texas, lists its registered address as 5900 Balcones Drive Suite 100, Austin, Texas 78731, and maintains its headquarters in Santa Clarita, California. (Am. Compl. ¶ 13.) Plaintiff alleges that Skelmis owns and operates the website www.remarkableherbs.com, used by Defendants to advertise, market, distribute and sell kratom products online. (*Id.*) It shares a manager with JOpen: non-defendant David Gabbay. (ECF No. 34-7 ¶¶ 1–2; ECF No. 29-9 at 18:4–6.) Tautline, LLC ("Tautline") is registered in Texas at the same address as Skelmis. (Am. Compl. ¶ 14; ECF No. 34-8 ¶ 3.) David Gabbay likewise manages Tautline. (ECF No. 34-8 ¶¶ 1–2.)

Plaintiff has provided specific allegations regarding Skelmis and Tautline's role in the Kratom Enterprise, identifying Skelmis as the owner and operator of the Remarkable Herbs website, which Defendants used to distribute and sell their kratom products online, and Tautline as Skelmis's manager. (Am. Compl. ¶ 13.) Yet, outside of the fact that Skelmis and Tautline share a manager with JOpen and Plaintiff's allegations that Skelmis operates a website dedicated to selling Remarkable Herbs products, the Court lacks sufficient evidence confirming either entities' relationship to JOpen. For the same reasons stated above as to FMK, the Court finds it necessary to allow Plaintiff to conduct limited jurisdictional discovery as to Skelmis and Tautline to elucidate the gaps in the record.

### h.      FastIncense.com

Plaintiff represents that "[t]he exact identity of Defendant FastIncense.com is unknown to Plaintiff at this time," because FastIncense.com purportedly hides its registration information. (Am. Compl. ¶ 15.)  However, Plaintiff alleges that FastIncense.com shares a registered agent with Skelmis and Tautline. (*Id.*)  According to Plaintiff, FastIncense.com is "the primary online retailer" of Defendants' products. (*Id.*)  In support of their Motion to Dismiss, Defendants submitted the declaration of Itamar David, who stated that he "was a manager at Fastincense.com," which "was based in Texas." (ECF No. 34-9 ¶¶ 1–3.)  Given David's referral to FastIncense.com in the past tense, the Court lacks sufficient information to determine whether FastIncense.com still constitutes an active entity and the precise role that it plays in the distribution of Defendants' products.  Thus, for the same reasons as with FMK, the Court orders limited jurisdictional discovery as to FastIncense.com to determine its exact role in the Kratom Enterprise and the Court's jurisdiction over it.

### b.      Conspiracy Theory of Jurisdiction

The Court next turns to Plaintiff's conspiracy theory of jurisdiction.  Taking Plaintiff's allegations together, Plaintiff argues that Individual Defendants conspired with each other, using JOpen, to perpetuate fraud in the sale and distribution of kratom throughout the United States. (Am. Compl. ¶¶ 18, 112, 191.)  Defendants counter that Plaintiff's Amended Complaint "offers no allegations that any non-JOpen defendant agreed to, directed, or ratified an overt act [of the conspiracy] in Virginia or even had any knowledge that the alleged conspiracy's effects would be felt in Virginia." (Mem. at 16.)

Where nonresident defendants are involved in a conspiracy, they may be haled into court on the basis of their co-conspirators' contacts with the forum, because "co-conspirators are

agents for each other." *Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 622 (E.D. Va. 2002) (quoting *Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher*, 635 F. Supp. 15, 18 (E.D. Pa. 1985)). Put differently, "[w]hen conspiring individuals act in a manner they could reasonably expect to have consequences in a particular forum, if one co-conspirator who is subject to personal jurisdiction in the forum commits overt acts in furtherance of the conspiracy, those acts are attributable to the other coconspirators, who thus become subject to personal jurisdiction even if they have no other contacts with the forum." *Indep. Printers Worldwide, Inc. v. Cole*, 2015 WL 4705507, at *8 (E.D. Va. Aug. 6, 2015) (internal quotation marks and citation omitted). In order for one co-conspirator's contacts to be imputed to another co-conspirator, a plaintiff must plausibly claim "(1) that a conspiracy existed; (2) that the [] defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).[23]

All of those elements are met here. JOpen constitutes the entity responsible for handling the packaging of Defendants' OPMS products, including the labeling of products that form the subject of the instant litigation. (Am. Compl. ¶ 86; ECF No. 29-9 at 13:7–21.) No parties contest that JOpen directed its distribution and advertising activities into Virginia, subjecting it to personal jurisdiction in this forum. Further, as explained more fully in the Court's analysis of the merits of Plaintiff's common law civil conspiracy claim, *see infra* Section II.B.3, Plaintiff

---

[23] To the extent that Defendants argue that *Unspam*'s test is foreclosed by the Supreme Court's holding in *Walden v. Fiore*, 571 U.S. 277 (2014), which emphasizes that personal jurisdiction must arise from contacts that a defendant itself makes, the Court disagrees. (Mem. at 15.) Indeed, "multiple courts, including this one, have continued to recognize *Unspam* and its conspiracy jurisdiction test in the near decade since *Walden*." *Galloway v. Martorello*, 2023 WL 5183204, at *9 (E.D. Va. Aug. 11, 2023) (citing cases).

38

plausibly pleads that Individual Defendants engaged in a conspiracy to promulgate misleading advertising for their products, using JOpen as the distributor of their misleadingly labeled products. (Am. Compl. ¶¶ 18, 192.) Because JOpen has sufficient contacts with Virginia meriting exercise of personal jurisdiction, the Individual Defendants' actions in furtherance of their alleged conspiracy to mislead consumers, utilizing JOpen, subjects them to the reach of personal jurisdiction in Virginia as well.

The Court finds instructive Plaintiff's cited case, *Galloway v. Martorello,* 2023 WL 5183204, at \*1 (E.D. Va. Aug. 11, 2023) (Payne, J.), which further supports a finding of jurisdiction over Individual Defendants based on a conspiracy theory of jurisdiction. That case involved an individual who formed "an elaborate and ever-shifting" web of companies in order "to make usurious short-term loans with interest rates in the triple digits" and "conceal his ownership interest in the companies." *Id.* at \*1. The Court found that one of that individual's companies "participated in the conspiracy by serving as a conduit" for the conspiracy's "ill-gotten funds." *Id.* at \*10. Because that company shared in the conspiracy's common plan by collecting, retaining and redistributing the profits from the purported conspiracy, the individual's contacts with the forum could be imputed to his company, even if the company itself had no connection to the forum. *Id.* at \*10–11.[24]

The same logic applies here, albeit in a reversed factual scenario. Plaintiff has plausibly alleged that Individual Defendants conspired to promulgate false advertising for their products,

---

[24] Defendants suggest that, because *Galloway* analyzed jurisdiction "under the expanded jurisdictional basis of Rule 4(k)(2)," its findings are not applicable here. (Mem. at 15.) The Court disagrees, because the same principles of conspiracy jurisdiction apply under Virginia law and under Rule 4(k)(2). *See Verizon Online Servs., Inc. v. Ralsky,* 203 F. Supp. 2d 601, 622 (E.D. Va. 2002) (applying the same principles and criteria as *Galloway* in considering conspiracy theory of jurisdiction under Virginia long-arm statute, rather than Rule 4(k)(2)).

and likewise asserts that JOpen constitutes the "hub of the Remarkable Herbs network" that manages the labeling and advertising of the product, serving as a conduit through which Individual Defendants effectuated their alleged conspiracy to defraud consumers. (Am. Compl. ¶¶ 112, 191.) Pursuant to these allegations, the Individual Defendants intended to promulgate misleading advertisements for their products, which JOpen placed on the products and subsequently distributed in Virginia. Such allegations are sufficient to establish a conspiracy theory of jurisdiction over Individual Defendants.[25]

### c.  Plaintiff's Claims Arise Out of JOpen's Contacts

Having found that various Remaining Defendants are subject to specific personal jurisdiction in this Court due to their relationship with JOpen as alter egos (Defendants Martian Sales, LGI, LP, and Calibre) or as co-conspirators (Defendants Palaio, Reilly and Jennings), the Court must determine whether Plaintiff's claims arise out of JOpen's activities, imputed to those Remaining Defendants, which were directed to the forum. *UMG Recordings, Inc v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020); *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 265 (2017) ("What is needed . . . is a connection between the

---

[25]     To the extent that Defendants argue that the doctrine of intracorporate immunity bars jurisdiction over Individual Defendants (Mem. at 29), the Court finds this doctrine inapposite as to Individual Defendants' relationship with JOpen, which is not managed by any Individual Defendant, but instead is managed by non-Defendant David Gabbay. Plaintiff alleges that Individual Defendants conspired with each other, using JOpen as their advertising arm, to misrepresent their products' addictive potential. Plaintiff separately alleges that Individual Defendants agreed to form the Kratom Enterprise's web of companies, and are involved in leadership in many of JOpen's alter ego companies. Yet, absent any finding by this Court that the Individual Defendants constitute agents of JOpen, the Individual Defendants remain separate legal entities from JOpen and thus capable of conspiring with JOpen. *See, e.g., Trans-Radial Sols., LLC v. Burlington Med., LLC*, 2019 WL 3557879, at *15 (E.D. Va. Aug. 5, 2019) (holding that the CEO of one corporation could conspire with a corporate defendant to form another corporation, and could subsequently conspire with both corporations to violate the law.)

forum and the specific claims at issue."). Plaintiff's allegations satisfy this requirement. Plaintiff alleges that he and the Virginia Subclass are residents of the forum who purchased Defendants' products in the forum in reliance on Defendants' omission of material information regarding their products' health risks. (Am. Compl. ¶¶ 8, 28, 29, 158.) Plaintiff's claims and class allegations thus arise out of the injury that he allegedly suffered as a result of JOpen's sale of Defendants' misleadingly labeled kratom products in Virginia, satisfying this third and final criterion for personal jurisdiction.

*    *    *    *

In sum, the Court finds that Plaintiff has adequately demonstrated that Organizational Defendants Martian Sales, LGI, LP, and Calibre constitute alter egos of Defendant JOpen, meriting piercing of those entities' corporate veil and imputing JOpen's contacts with Virginia to those Defendants. Likewise, the Court finds that Plaintiff has sufficiently established specific personal jurisdiction over Individual Defendants Palaio, Jennings and Reilly based on their purported acts in furtherance of a conspiracy with JOpen. The Court will DENY Defendants' Motion to Dismiss Pursuant to 12(b)(2) (ECF No. 33) as to Defendants Martian Sales, LGI, LP, Calibre, Palaio, Jennings and Reilly, and proceeds to address Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) as to those Defendants only.

As to Organizational Defendants Skelmis, Tautline, FastIncense.com, FMK and CAG Holdings CO, the Court lacks sufficient information to determine whether these entities function as JOpen's alter egos. Thus, the Court will GRANT Plaintiff's request for jurisdictional discovery as to those Defendants. The Court will delineate the parameters of that jurisdictional discovery in the Order accompanying this Memorandum Opinion. The Court's following

41

12(b)(6) analysis does not apply to those Remaining Organizational Defendants pending jurisdictional discovery.

### B.   Defendants' 12(b)(6) Motion

The Court now turns to the merits of Plaintiff's Amended Complaint against Organizational Defendants Martian Sales, LGI, LP and Calibre, and Individual Defendants Palaio, Jennings and Reilly.

First, as a threshold matter, Plaintiff has expressly conceded that the Amended Complaint's claims for breach of implied warranty (Count II) and unjust enrichment (Count III) should be dismissed.  (Opp. at 6, n.1.)  Accordingly, the Court will grant Defendants' Motion to Dismiss as to Counts II and III of the Amended Complaint.

The Court proceeds with its analysis as to the remaining counts in Plaintiff's Amended Complaint:  fraudulent omission under both the VCPA (Count I) and Virginia common law (Count IV) against all Defendants; and common law civil conspiracy against the Individual Defendants only (Count V).  Defendants argue that Plaintiff's claims of fraudulent omission under Counts I and IV fail, because they do not satisfy Federal Rule of Civil Procedure 9(b)'s heightened particularity requirement.  (Mem. at 16–19, 22–23.)  Defendants also argue that Plaintiff fails to show the requisite elements required to establish fraud by omission.  (Mem. at 19, 22; Reply at 10.)[26]  Plaintiff counters that as to his fraud-based claims, he has "met his burden under . . . the standard 9(b) pleading requirements" and the relaxed standard for

---

[26]   The Court notes that Defendants also include various arguments asserting that Plaintiff failed to state a claim under the VCPA's specific provisions penalizing various types of misrepresentations, deception, or unfair conduct.  (Mem. at 23–26 (arguing that Plaintiff has failed to state a claim under VCPA §§ 59.1-200(A)(5), (6), (8), (14), and (77).)  Because the Court finds that Plaintiff adequately pleads his VCPA count for purposes of Rule 12(b)(6) for the reasons discussed below, the Court does not address additional arguments raised by Defendants as to Plaintiff's other theories of VCPA liability.

42

fraudulent omission claims. (Opp. at 17.) Plaintiff also argues that he has pled all of the elements required to establish that Defendants intentionally and knowingly omitted a material fact, rendering their omission actionable under both the VCPA and Virginia common law. (*Id.* at 19–22.)

As to Count V, Defendants argue that Plaintiff has failed to allege a common law civil conspiracy against Individual Defendants, because (1) Plaintiff's underlying causes of action fail to state a claim that an underlying tort was committed, as required for a successful civil conspiracy claim, and (2) Plaintiff has failed to plead sufficient allegations that an actual meeting of the minds took place between Individual Defendants. (Mem. at 29, 30.)[27] Plaintiff argues that he has adequately pleaded that Defendants committed an underlying tort of fraud by omission, justifying the imposition of liability for conspiracy. (Opp. at 31.) Plaintiff also argues that "almost the entirety of the 53-page Amended Complaint supports Plaintiff's conspiracy allegations." (*Id.*)

The Court begins by analyzing the merits of Plaintiff's fraud-based claims (Counts I, IV) under the similar standards of the VCPA and Virginia common law, before turning to Plaintiff's civil conspiracy claim (Count V). For the reasons more fully set forth below, the Court finds Plaintiff's specific and particularized allegations of fraudulent omission and civil conspiracy sufficient to survive dismissal at the 12(b)(6) stage. The Court will accordingly deny Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) as to Counts I, IV and V.

---

[27] Defendants' additional arguments against Plaintiff's conspiracy allegations stand predicated on their assumption that Defendants aside from JOpen are not subject to this Court's personal jurisdiction. (Mem. at 29–30.) In light of the Court's finding that it retains personal jurisdiction over JOpen and all Individual Defendants, these arguments necessarily fail. *See supra* Section II.A.2.a.ii.

43

### 1.    Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court accepts the well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under Federal Rule of Civil Procedure 8(a), a complaint must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  As the Supreme Court opined in *Twombly*, a complaint must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.*  Ultimately, "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570.  Thus, a complaint must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557.  The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

### 2.    Fraud-Based Claims (Counts I and IV)

The Court begins by providing a general overview of Plaintiff's fraud-based claims under Virginia common law (Count IV) and the VCPA (Count I).

44

First, Plaintiff alleges that Defendants committed fraud by omission, in violation of Virginia common law, when they failed to disclose on their products' packaging that kratom "is addictive, or is potentially addictive, and can cause opioid-like withdrawal." (Am. Compl. ¶ 184.) To successfully allege fraud under Virginia common law, a plaintiff must plausibly allege: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *State Farm Mut. Auto. Ins. Co. v. Remley*, 618 S.E.2d 316, 321 (Va. 2005); *see also Van Deusen v. Snead*, 441 S.E.2d 207, 209–10 (Va. 1994) (discussing the same elements with respect to fraudulent concealment). "For a fraudulent concealment claim, or a claim of fraud by omission, a plaintiff satisfies the false representation element through a showing that the defendant concealed facts which the defendant had a duty to disclose." *Dev. Pros. Inc.-Making Cents Int'l LLC v. Bank of Am., N.A.*, 805 F. Supp. 3d 680, 690 (E.D. Va. 2025). A duty to disclose arises when (1) an omitted fact is material and the one concealing it has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; or (2) if one party takes makes a partial disclosure of the truth, but takes actions to divert the other party from making prudent investigations of the fact or to throw the other party off guard. *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999).

Relatedly, Plaintiff alleges that Defendants violated the VCPA, because Defendants owed Virginia consumers a duty to disclose the "true safety" of their kratom products and (1) failed to disclose that their products "pose a risk of physical and psychological dependence," (Am. Compl. ¶¶ 150–51), and (2) disseminated uniform advertising marketing the products as "safe, reliable, and of high quality," while actively concealing the addictive nature of kratom, (Am. Compl. ¶¶ 152–55), thereby violating that duty. The VCPA constitutes "remedial legislation to

45

promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code § 59.1-197. "To state a cause of action under the VCPA, a plaintiff must allege (1) fraud[28] (2) by a supplier (3) in connection with a consumer transaction." *Borg v. Warren*, 545 F. Supp. 3d 291, 322 (E.D. Va. 2021). Furthermore, "Virginia courts have consistently held that reliance is required to establish a VCPA claim." *Adardour v. Am. Settlements Inc.*, 2009 WL 1971458, at *3 (E.D. Va. July 2, 2009).

Thus, while a VCPA claim stands "distinct from and in addition to common law fraud," Plaintiff's VCPA claim here necessarily encompasses his fraudulent concealment claim at this stage of litigation, because in order to adequately state a claim under either theory of liability, Plaintiff must allege identical elements of fraudulent concealment. *Kruglyak v. Home Depot U.S.A., Inc.*, 750 F. Supp. 3d 644, 660 (W.D. Va. 2024), *aff'd sub nom. Kruglyak v. Phoebus*, 2025 WL 3296044 (4th Cir. Nov. 26, 2025).

The Court now turns to Defendants' Rule 9(b) arguments and then discusses whether Plaintiffs has established the additional required elements of his VCPA and common law fraud claims.

### a.      Rule 9(b)

Both Plaintiff's VCPA claim (Count I) and fraudulent omission claim (Count IV) are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *See Myers v.*

---

[28]      The VCPA's statutory language covers a broad range of unlawful conduct, not merely fraud, and even penalizes inadequate warnings regarding kratom's health risks. *See* Va. Code § 59.1-200 (14) (prohibiting "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction"); Va. Code § 59.1-200 (77)(ii) (prohibiting the "selling or offering for sale . . . (ii) any kratom product that does not include a label listing all ingredients and with the following guidance: 'This product may be harmful to your health, has not been evaluated by the FDA, and is not intended to diagnose, treat, cure, or prevent any disease.'")

46

*Lee,* 2010 WL 2757115, at *6 (E.D. Va. July 12, 2010) ("As a claim sounding in fraud, Rule 9(b)'s particularity requirements apply to the VCPA"). Failure to comply with Rule 9(b)'s pleading standard is treated as a failure to state a claim under Rule 12(b)(6). *Berl v. BMW of N. Am., LLC,* 797 F. Supp. 3d 621, 629 (W.D. Va. 2025). Yet, a court "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which it will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Edmonson v. Eagle Nat'l Bank,* 922 F.3d 535, 553 (4th Cir. 2019).

Under Rule 9(b), parties alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity requires that a plaintiff "must allege the who, what, when, where and how of the alleged fraud." *United States ex rel. Ahumada v. NISH,* 756 F.3d 268, 280 (4th Cir. 2014) (internal quotation omitted). Malice, intent, knowledge, and other conditions of a person's mind may, however, be alleged generally. Fed. R. Civ. P. 9(b). When a plaintiff's fraud claim is based on a defendant's omission, such as the claims at issue here, the "what, when, and where" requirements are relaxed, because "omissions cannot be described in terms of the time, place, and contents of the misrepresentation[.]" *Doll v. Ford Motor Co.,* 814 F. Supp. 2d 526, 538 (D. Md. 2011). Instead, Rule 9(b)'s particularity requirements are "less formulaic with fraud claims based on omissions of material fact." *Fravel v. Ford Motor Co.,* 973 F. Supp. 2d 651, 656 (W.D. Va. 2013). Plaintiffs may "partly rely on information and belief without running afoul of Rule 9(b)" as long as they "state the factual allegations that make their belief plausible." *Corder v. Antero Res. Corp.,* 57 F.4th 384, 402 (4th Cir. 2023). Plaintiffs can satisfy Rule 9(b)'s requirements by specifying allegations showing "the type of facts omitted, the place in which the omission should have appeared, and the way in

47

which the omitted facts made the defendant's affirmative representations misleading." *Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 645 (E.D. Va. 2003); *see Gurwell v. Sea World Parks & Ent. LLC*, 2021 WL 4168503, at *5 (E.D. Va. Aug. 11, 2021) (same).

Defendants argue that Plaintiff's allegations fail to clear Rule 9(b)'s bar. First, Defendants argue that Plaintiff does not adequately describe "who" perpetuated the fraudulent omissions, because he fails to name the specific defendants responsible, instead bringing "conclusory single enterprise allegations." (Mem. at 22.) Certainly, "[g]rouping defendants together in a pleading fails to satisfy the requirement that the who, what, when, where, why, and how, be pled with specificity." *Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006). However, the Court declines to dismiss Plaintiff's fraud-based claims on the basis of this argument. As this Court recently noted in a fraud case, "courts have been hesitant to dismiss complaints . . . where there is an allegation of group liability under each claim." *Marriott Int'l, Inc. v. Dynasty Mktg. Grp. LLC*, 2022 WL 20699258, at *4 n.12 (E.D. Va. Sept. 21, 2022). At this stage in the litigation, "Plaintiffs cannot be expected to know the exact . . . degree of each Defendant's involvement . . . prior to discovery." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017). Further, the fact that Plaintiff's allegations of fraud are stated against all Defendants, which "are intertwined through a complex corporate structure[] . . . supports allowing Plaintiff[] an opportunity to more clearly assess each Defendant's role in the alleged conduct during discovery." *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, 779 F. Supp. 3d 666, 709 (E.D. Va. 2024) (internal quotation marks and citation omitted).

Moreover, this Court is satisfied that, with the limited information in Plaintiff's possession, Plaintiff has provided sufficient allegations explaining Defendants' various roles in

48

an "ever-growing and evolving web of separate corporations" engaged in marketing and distributing Defendants' kratom products while omitting material information regarding those products' health risks. (Am. Compl. ¶ 104.)   Plaintiff uses the generic term "Defendants" throughout his Amended Complaint, but he makes particularized allegations regarding various Defendants' respective roles in the larger Kratom Enterprise,[29] all of which satisfy the heightened pleading standard of Rule 9(b) regarding the "who" of the alleged fraud. *Ahumada*, 756 F.3d at 280; (*see* Am. Compl. ¶¶ 9–22.)   Accordingly, even though the Amended Complaint does not distinguish between every Defendant in every allegation, Plaintiff's assertions regarding Defendants' various roles in the larger Kratom Enterprise, and in turn their roles in Defendants' fraudulent scheme, provide Defendants with sufficient information to prepare a defense at trial and are thus sufficiently specific to avoid dismissal at this stage. *Edmonson*, 922 F.3d at 553.

As to the "what, when, where, and how" of the alleged fraud, the Court also finds that Plaintiff identifies these elements with sufficient particularity under the more relaxed Rule 9(b) standards governing fraud by omission. First, Plaintiff has alleged with specificity "the type of facts omitted, the place in which the omission should have appeared, and the way in which the omitted facts made the defendant's affirmative representations misleading." *Morris*, 277 F. Supp. 2d at 645.  Plaintiff alleges exactly the information that Defendants failed to include on their products:  warnings that "kratom is similar to an opioid, is habit-forming, and that regular

---

[29] The Court notes that its holding applies only to Organizational Defendants JOpen, Martian Sales, LP, LGI and Calibre.  In its jurisdictional analysis as to those Defendants, the Court discussed those entities' specific roles in the larger Kratom Enterprise. *See supra* Section II.A.2.a.ii.a-e.  To the extent that the Court lacks information as to other Remaining Organizational Defendants' role in the larger Kratom Enterprise, the Court has ordered jurisdictional discovery as to those Defendants.  Thus, Defendants' concerns regarding Plaintiff's purportedly "conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others," stand misplaced here. (Mem. at 22 (quoting *Haley v. Corcoran*, 659 F. Supp. 2d 714, 721 (D. Md. 2009).)

use will result in opioid-like dependency with withdrawal symptoms similar to those of traditional opioids." (Am. Compl. ¶ 60.) Plaintiff also specifies exactly where those omitted facts should have appeared: on the products' packaging. (*See id.* ¶ 150 ("Defendants had a duty to consumers to disclose on the Products' labels that the Products pose a risk of physical and psychological dependence.") Finally, Plaintiff identifies the specific way in which the omission of those facts caused consumers to be misled about the safety and addictive properties of kratom. (*See id.* ¶¶ 158 ("consumers reasonably rely on Defendants' labels, and thus also Defendants['] omissions"); 187 (consumers reasonably assumed "that a product that is addictive, or has a risk of being addictive, like an opioid, would bear a warning on its packaging"); 188 ("As a result of Defendants' omissions," Plaintiff and the putative class members paid for "[p]roducts they may not have purchased, or paid more for those [p]roducts than they would have, had they known the truth about kratom").) Such allegations clearly set out what, when, where and how Defendants omitted material information on their products' packaging, and therefore satisfy Rule 9(b)'s requirements.

Defendants do not offer any arguments that successfully undermine Plaintiff's particularized and clear allegations, especially given Rule 9(b)'s relaxed standard in the fraud-by-omission context. Aside from arguing that Plaintiff has failed to identify a fraudulent misstatement (Mem. at 17) — an obviously inapposite argument in the context of Plaintiff's fraudulent *omission* claims — Defendants simply assert that "Plaintiff's allegations fall far short of" Rule 9(b)'s standards for omissions without explaining how Plaintiff's specific allegations regarding the omitted information and manner of omission fail to provide Defendants with sufficient details to prepare a defense. (Reply at 9.) Defendants' vague arguments thus fail to defeat Plaintiff's viable and specific fraudulent omission claims.

50

Further, as required to state a claim for fraudulent concealment, the Court finds that Plaintiff adequately alleges that Defendants had a duty to disclose material information to their customers and identifies the source of that duty: Defendants' "exclusive or superior knowledge of kratom's addictive nature." (Am. Compl. ¶ 156). Plaintiff alleges that Defendants possess specialized knowledge regarding kratom's addictive nature due to their unique roles in building what they tout as "the longest running [and] most-trusted commercial Kratom company in the U.S." (*Id.* ¶ 119.) Defendants, in manufacturing the products, employ "highly technical knowledge about kratom and its alkaloids to synthesize the Products," and as importers of raw kratom, are required to remain abreast of and comply with the regulatory regimes of a plethora of international, national and state health and food-safety agencies, many of whom have promulgated alerts regarding kratom's addictive properties. (*Id.* ¶¶ 116, 119 (Defendants' website represents that "Remarkable Herbs products are labeled correctly, complying with existing and upcoming state regulations"); Opp. at 21 ("It strains logic to believe that Defendants, in their attempts to acquire raw kratom to produce their Products, were not aware of any of these statements or alerts").) Relatedly, Plaintiff alleges that even if Defendants did not definitively know of kratom's addictive nature, they knew of its "potentially addictive nature," and likewise knew that the risk of addiction "is a material fact that would influence the purchasing decisions of reasonable consumers because addiction is an unreasonable health hazard." (*Id.* ¶ 185.) Plaintiff points to the fact that Defendants named one of their products "Kratom OPM," which is "obviously . . . a nod to opium," demonstrating that they knew that kratom shared opium's addictive characteristics and health risks. (Am. Compl. ¶ 64; Opp. at 22.) Such allegations suffice to satisfy Rule 9(b), which permits Defendants' knowledge and intent to be averred generally at the motion to dismiss stage.

51

Defendants improperly attempt to rebut Plaintiff's general allegations regarding their knowledge and intent, triggering their duty to disclose, by raising factual disputes that may not be resolved at this stage of the litigation. For instance, Defendants attempt to disprove Plaintiff's factual allegations regarding kratom's addictive potential, and argue that because "the science on the addictive potential of kratom, and the extent of withdrawal symptoms, is still evolving," they did not have actual knowledge that kratom has addictive properties meriting a warning. (Mem. at 20 (citing a variety of scientific and news articles of which the Court declines to take judicial notice).) Such factual disputes are inappropriately raised at the motion to dismiss stage. *Republican Party of N.C.*, 980 F.2d at 952. Further, at the motion to dismiss stage, Rule 9(b) allows Plaintiff to bring "conclusory allegations of defendant[s'] knowledge as to the true facts and of defendant[s'] intent to deceive." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999); *Corder*, 57 F.4th at 402 (when certain facts are peculiarly within the defendants' knowledge, such as their intent to deceive and knowledge of material omissions, "plaintiffs may partly rely on information and belief.") Nowhere do Defendants reckon with Rule 9(b)'s permissive standard as to Plaintiff's allegations regarding their actual knowledge or intent to deceive, giving rise to their duty to disclose.

Lastly, the Court acknowledges that a plaintiff must also plead "reasonable, detrimental reliance . . . with particularity" under Rule 9(b). *Xia Bi v. McAuliffe*, 927 F.3d 177, 184 (4th Cir. 2019). Stated broadly, "[r]eliance at its core is the action or inaction of a party that results from the misrepresentation of another." *White v. Kennedy Krieger Inst., Inc.*, 110 A.3d 724, 744 (Md. 2015) (defining "reliance" in the context of a Maryland fraudulent misrepresentation claim). Reliance in the fraud context must be "reasonable and justified." *Adardour*, 2009 WL 1971458 at *3 (analyzing a VCPA claim). "Reasonable reliance poses a higher standard than justified

52

reliance." *Gurwell*, 2021 WL 4168503, at *7 (cleaned up). "Failure to plead reasonable reliance is fatal to a common law fraud claim." *Ostolaza-Diaz v. Countrywide Bank, N.A.*, 360 F. App'x 504, 506 (4th Cir. 2010). A plaintiff cannot be said to have reasonably relied on an omission or representation if they failed to read available public information contradicting their belief. *See Johnson v. Washington,* 559 F.3d 238, 245 (4th Cir. 2009) ("Plaintiffs cannot be heard to complain when they failed to read the relevant documents.").

Plaintiff provides sufficiently particularized allegations of reliance on Defendants' omissions. He alleges that he specifically relied on Defendants' omission of material information when he first purchased Defendants' products in or around 2022 in a smoke shop in Virginia. (Am. Compl. ¶ 8.) He alleges that, in his search for herbal alternatives to pain management following a car accident, he "reviewed the Products' packaging" and considered the fact that no warning as to any addictive properties was included when purchasing Defendants' products. (*Id.*) He alleges that "a warning on the Products['] packaging would have corrected his belief [that kratom was not addictive], but there was none." (*Id.*) Further, Plaintiff attaches a representative image of one of Defendants' products as an example of Defendants' fraudulent omission of relevant safety information. The package instructs consumers to "[c]onsult your healthcare professional to determine if this product is right for you, and if so, how to use it safely." (*Id.* ¶ 121.) It also contains a warning that the product is "NOT FOR SALE TO MINORS! 21+ ONLY." (*Id.*) Nowhere does the packaging mention any risk of addiction or withdrawal symptoms. Plaintiff also alleges that the Virginia Subclass relied on Defendant's packaging in a similar manner. (*Id.* ¶ 158.) Such specific allegations as to how Plaintiff learned of and subsequently relied on Defendants' omissions suffice to satisfy 9(b)'s pleading standard. *Cf. Xia Bi,* 927 F.3d at 185 (upholding dismissal of fraud claim when plaintiff did not specify

which named plaintiff claimed to have relied on the fraudulent misstatement, or where or how any specific plaintiff heard or learned of the alleged statements.)

In opposition, Defendants seem to argue that Plaintiff's Amended Complaint contradicts his assertions that he reasonably relied on their omissions when purchasing their products. In support of this argument, Defendants cite Plaintiff's allegations regarding the history and regulations governing kratom to imply that consumers already are generally aware that kratom can be addictive, defeating any reasonable reliance on omitted information regarding its purported health risks. (Mem. at 21 (citing Am. Compl. ¶¶ 30).) Plaintiff's Amended Complaint plausibly rebuts Defendants' assertion. Plaintiff states that kratom sellers, like Defendants, widely market kratom "as an herbal medicine or natural supplement to 'treat' a variety of ailments . . . and/or obtain a 'legal' or 'natural 'high,'" and asserts that, because of that advertising, "most Americans are completely unaware of kratom's addictive properties." (Am. Compl. ¶¶ 4, 33, 51.) Further, Plaintiff alleges that even when users conduct research on kratom, results available to the general public are ambiguous as to kratom's addictive properties, as exemplified by one kratom user who reported that he "researched kratom before using it and almost every site promoted that it[']s harmless with healthy benefits . . . Information wasn't clear that kratom could become a negative addiction that takes months to recover." (*Id.* ¶ 57.) In light of these allegations, the Court finds Plaintiff's claim that he reasonably relied on Defendants' lack of warning about kratom's addictive potential plausible and sufficiently alleged.

Defendants also argue that Plaintiff's representative image of their product undermines Plaintiff's claim that they failed to disclose to consumers that "kratom can be habit forming, among other things." (Mem. at 22.) Defendants argue that a reasonable consumer should understand from their packaging's suggestion to consult with a healthcare professional that

54

"kratom can be abused and with potential adverse health effects [*sic*]." (*Id.*) The Court disagrees. Although Defendants' disclaimers and warnings advise consumers to consult their healthcare professional about the safety of the kratom product and generally warn of potential health risks, the Court agrees with Plaintiff that any such warnings stand "entirely devoid of any [statement] about the Products' potential for addiction," which constitute the relevant omissions here. (Opp. at 26.)

In sum, and for all the reasons discussed above, the Court finds that Plaintiff has alleged his fraudulent omission claims with the requisite particularity to satisfy Rule 9(b).

### b.   Damages under the VCPA and Virginia common law

The Court now turns to assessing whether Plaintiff has adequately pleaded the sole remaining element of his fraudulent omission claims[30]: that he suffered damages as a result of Defendants' fraudulent omissions. *Van Deusen*, 441 S.E.2d at 2090 (requiring allegations of damages for fraudulent omissions under Virginia law); *Orr v. Keystone RV Co.*, 736 F. Supp. 3d 389, 397 (E.D. Va. 2024) ("Misrepresentation cases brought under the VCPA also require plaintiffs to show . . . damages.") Here, Plaintiff alleges that he was damaged by Defendants' material omissions, because he became addicted as a result of his purchases, suffering physical illness from his withdrawal symptoms. (Am. Compl. ¶ 8.) Plaintiff also alleges that he suffered economic damages by continuing to pay for the products due to his addiction to them, "even though he wishes to stop." (*Id.* ¶¶ 8; 158 (alleging that Plaintiff and class members suffered

---

[30]   A claim under the VCPA also requires two threshold elements to be met: Plaintiff must allege that the fraudulent omission was promulgated (1) by a supplier in (2) a consumer transaction. *Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 845 (E.D. Va. 2015). Defendants do not dispute that they are considered suppliers under the VCPA, nor do they dispute that their sale of kratom constitutes a consumer transaction. The Court thus finds that Plaintiff has plausibly alleged these elements of his VCPA claim as well.

"ascertainable loss" as a result of their purchases); 188 (same, and alleging that Plaintiff and class members "paid more for those products than they would have, had they known the truth about kratom.").) Construing all allegations in the light most favorable to Plaintiff, the Court finds that his allegations of damages stand sufficient to establish that Plaintiff relied on Defendants' omissions to his economic and physical detriment.

Accordingly, and for all of the reasons stated in its preceding Rule 9(b) analysis, the Court finds that Plaintiff has sufficiently stated a claim for fraudulent omission under both the VCPA (Count I)[31] and Virginia common law (Count IV). The Court will therefore DENY Defendants' Motion to Dismiss Pursuant to 12(b)(6) as to Plaintiff's fraud-based claims under the VCPA (Count I) and Virginia common law (Count IV).

### 3.   Plaintiff's Conspiracy Claim (Count V)

Finally, the Court turns to Plaintiff's civil conspiracy claim against Individual Defendants (Count V). In his Amended Complaint, Plaintiff alleges that Individual Defendants entered into an agreement to commit fraud by "unlawfully mislead[ing] consumers into believing that the Products are not addictive when they actually are, in order to maximize their profits and line their pockets," all through failing to warn consumers and falsely advertising their products. (Am. Compl. ¶¶ 190–92.) Defendants have sought dismissal of that claim for two relevant reasons: (1) Plaintiff does not adequately allege that the relevant underlying tort, fraud, was committed, as required for a successful civil conspiracy claim, and (2) Plaintiff has failed to

---

[31]   The Court notes Defendants' arguments that Plaintiff failed to state a claim under the VCPA's specific provisions penalizing various types of misrepresentations, deception, or unfair conduct. (Mem. at 23–26 (arguing that Plaintiff has failed to state a claim under VCPA §§ 59.1-200(A)(5), (6), (8), (14), and (77).) However, because the Court has found that Plaintiff adequately alleged a violation of the VCPA on his fraudulent omission theory, Count I survives and the Court need not engage with the merits of Plaintiff's other theories of VCPA liability.

plead sufficient allegations of conspiracy to survive a motion to dismiss. (Mem. at 29, 30.)[32] For the following reasons, the Court concludes that Plaintiff has stated a plausible claim of civil conspiracy under Virginia law against the Individual Defendants and rejects Defendants' motion accordingly.

The Court briefly disposes of Defendants' first argument. Defendants are correct that under Virginia law, "a common law claim of civil conspiracy [to commit a tort] generally requires proof that the underlying tort was committed." *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007). But the Court has already found that Plaintiff sufficiently pleaded a claim for fraud, the relevant tort, under Virginia law against all Defendants. *See supra* Section II.B.2. Accordingly, Plaintiff can pursue his common law conspiracy claim against Individual Defendants under his conspiracy-to-defraud theory. *Vivos Acquisitions, LLC v. Health Care Res. Network, LLC*, 2020 WL 13622385, at *10–11 (E.D. Va. Dec. 30, 2020) (finding that, because counter-plaintiffs "adequately alleged their fraud claim," and thus "successfully alleged the underlying tort," their common law conspiracy claims under Virginia law survived as well).

The Court also disagrees with Defendants' second argument. In Virginia, "[a] common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Bhattacharya v. Murray*, 93 F.4th 675, 698 (4th Cir. 2024) (quoting *The Country Vintner, Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006).) A plaintiff must show "1) an agreement between two or more persons; 2) to participate in an unlawful act, or a lawful act in an unlawful manner; 3) an injury caused by an unlawful overt act performed by one of the parties

---

[32]   The Court does not consider Defendants' additional arguments for the reasons explained *supra,* note 27.

57

to the agreement; and 4) that the overt act was done pursuant to and in furtherance of the common scheme." *Flexible Benefits Council v. Feltman*, 2008 WL 2465457, at *9 (E.D. Va. June 16, 2008) (citing *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985) (other citation omitted). "The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy," which is generally a question for the jury. *Comm. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995).

To survive a motion to dismiss a civil conspiracy claim, a plaintiff "must at least plead the requisite concert of action and unity of purpose in more than mere conclusory language." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003). The court must have "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement . . . [w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 712 (E.D. Va. 2009) (quoting *Twombly*, 550 U.S. at 556–57). Plaintiff must also allege that Defendants conspired to commit either an unlawful act or acts with an unlawful purpose. *Bay Tobacco*, 261 F. Supp. 2d at 499.

Defendants argue that Plaintiff asserts bare allegations of conspiracy and has offered no facts that support the existence of such a conspiracy, necessitating dismissal. (Mem. at 30.) Yet, Plaintiff provides specific allegations as to the three Individual Defendants' "concert of action and unity of purpose" in coming to an agreement to commit unlawful acts. *Bay Tobacco, LLC*, 261 F. Supp. 2d at 499. For instance, Plaintiff has alleged that Palaio, Reilly and Jennings have agreed to market their products "as if they are nothing more than over-the-counter supplements," in order to "obfuscate[] the very truth that they are selling a strong narcotic to consumers who

58

likely do not fully comprehend the risks associated with consuming the Products." (Am. Compl. ¶ 120.) According to Plaintiff, Individual Defendants are motivated to omit such information, because they understand that addictive potential "is a material fact to reasonable consumers that would influence their purchasing and consumption decisions, likely to Defendants' financial detriment." (*Id.* ¶ 128.)

Plaintiff has also alleged that Individual Defendants formed the Kratom Enterprise to avoid liability for their actions. According to Plaintiff, Defendants Palaio and Reilly, after "two close brushes with the law, and a host of wrongful death lawsuits" triggered by their former synthetic cannabis operation, formed the Kratom Enterprise to "obscure the totality of their efforts in furtherance of their Enterprise" and avoid "liability for the harms caused by the[ir] Products." (*Id.* ¶¶ 68, 69, 105.) Plaintiff alleges that Jennings, who manages many of the Organizational Defendants, also played a role in forming the Kratom Enterprise by connecting Defendant Martian Sales with Defendant JOpen and working "closely with the Defendants to direct the operations of the Kratom Enterprise." (*Id.* ¶¶ 11, 96.)

The Court finds Plaintiff's allegations far from conclusory. Plaintiff's Amended Complaint provides details regarding Individual Defendants' agreement to mislead consumers through material omissions regarding their products' addictive properties in order to profit financially, specifically identifying their unlawful actions. Further, Plaintiff identifies when, how, and why Individual Defendants formed a web of corporations constituting the Kratom Enterprise to continue producing their addictive products without appropriate warnings and to evade liability for any ensuing harm caused by their misleading advertising. Plaintiff's Amended Complaint also raises a reasonable expectation that further discovery could provide evidence of

Individual Defendants' agreement to form the Kratom Enterprise and withhold material information regarding kratom's addictive potential from consumers.

Accordingly, the Court will DENY Defendants' Motion to Dismiss Pursuant to 12(b)(6) as to Plaintiff's civil conspiracy claim (Count V).

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART Defendant's Motion to Dismiss (ECF No. 33).  Specifically, the Court will:

(1)    DENY Defendant's Motion to Dismiss pursuant to 12(b)(2) as to Individual Defendants Palaio, Reilly and Jennings and Organizational Defendants Martian Sales, LGI, LP, and Calibre;

(2)    GRANT Defendant's 12(b)(6) Motion as to Counts II and III and DISMISS these counts in their entirety WITHOUT PREJUDICE;

(3)    DENY Defendant's 12(b)(6) Motion as to the following counts and parties, all of which shall proceed to discovery:

Count I:      as to Defendants Palaio, Reilly, Jennings, JOpen, Martian Sales, LGI, LP and Calibre;

Count IV:    as to  Defendants Palaio, Reilly, Jennings, JOpen, Martian Sales, LGI, LP, and Calibre;

Count V:     as to Defendants Palaio, Reilly and Jennings.

(4)    GRANT Plaintiff's Request for Jurisdictional Discovery as to Defendants Skelmis, Tautline, FastIncense.com, FMK and CAG Holdings CO; and

(5)    HOLD IN ABEYANCE Defendant's Motion to Dismiss pursuant to 12(b)(2) and 12(b)(6) as to those Defendants pending the completion of jurisdictional discovery.

61

An appropriate Order shall issue.  The Court will delineate the parameters of the parties'

jurisdictional discovery in the Order accompanying this Memorandum Opinion.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  June 17, 2026